Commonwealth *v.* Tyrrell, Appellant.

Argued September 25, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*William C. Cassebaum,* with him *Edward J. Danser,* for appellant.

*Andrew L. Herster, Jr.,* District Attorney, with him *Charles H. Spaziani,* Assistant District Attorney, for Commonwealth, appellee.

Opinion by Mr. Chief Justice Bell, November 14, 1961:

Defendant entered a plea of guilty to murder and the Court (Judges Palmer and Woodring), after hearing all the evidence, fixed the crime as murder in the first degree and sentenced defendant to life imprisonment. Defendant contends he had no intent to kill his wife and therefore he was guilty only of murder in the second degree. Because this is a murder case, we shall review the evidence and the applicable principles of law at some length.

Defendant admitted that on the morning of March 7, 1960, he shot and killed his wife in their living room with a 20-gauge shotgun. The shot (pellets) struck the victim on the upper front portion of her chest, tore away the pulmonary veins and punctured the left lung. The pathologist testified that Mrs. Tyrrell died within sixty seconds or less after being shot.

The Penal Code of 1939* provides: "Offenses Against the Person. Section 701. Murder of the First and Second Degree.—All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, . . . shall be murder in the first degree. All other kinds of murder shall be murder in the second degree."

The distinguishing criterion or hallmark of murder is legal malice, express or implied. Malice is an absolutely essential ingredient of murder. *Commonwealth v. Bolish,* 381 Pa. 500, 510, 113 A. 2d 464; *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A. 2d 125; *Commonwealth v. Malone,* 354 Pa. 180, 47 A. 2d 445. The essential difference in a nonfelony murder-killing between murder in the first degree and murder in the second degree is that murder in the first degree re-

---

* Act of June 24, 1939, P. L. 872, §701, 18 PS §4701.

quires a specific intent to take the life of another human being: *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728; *Commonwealth v. Dorazio,* 365 Pa., supra; *Commonwealth v. Malone,* 354 Pa., supra; *Commonwealth v. Chapman,* 359 Pa. 164 58 A. 2d 433; *Commonwealth v. Jones,* 355 Pa. 522, 50 A. 2d 317; *Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823.

In *Commonwealth v. Chapman,* supra, the Court said: "A plea of guilty to the charge of murder is not a plea of guilty in the first degree . . . The burden is upon the Commonwealth to establish the essential elements of a higher degree of crime,—the specific intent to take human life," rests upon the Commonwealth. See to the same effect: *Commonwealth ex rel. Dandy v. Banmiller,* 397 Pa. 312, 155 A. 2d 197; *Commonwealth v. Jones,* 355 Pa., supra; *Commonwealth v. Iacobino,* 319 Pa., supra.

Did the Commonwealth prove beyond a reasonable doubt all the essential elements of first degree murder? We quote with approval the following summary of the testimony from the Opinion of the Court below:

"Saturday, March 5, 1960, . . . defendant called at the home of Thurston Miller and asked to borrow a shotgun, which request was refused. The next day, March 6, defendant asked Mr. Miller for a 20-gauge shell with No. 6 shot. Defendant said that he was collecting shells and wanted this one for his collection. Mr. Miller gave one shell to defendant. On March 7, the day of the fatal shooting, at 9:30 a.m., Miller was present in Lillian Dickey's home when defendant borrowed a 20-gauge shotgun. Defendant said, 'I want to shoot a red squirrel.'

"Marie Weston, who lived in an apartment in the Blanche Tyrrell house, testified that on Sunday, March 6, a 'heavy' argument took place between defendant and Blanche, defendant used vile language toward his wife, became furious and threw a cup and saucer on the floor. Mrs. Weston testified that 'a couple days' prior

to March 7, Blanche gave her (Mrs. Weston) a small revolver and some shells. (The Commonwealth argues that this is an indication that Blanche Tyrrell was afraid of her husband and sought to remove the firearm from his presence.) Concerning the morning of the shooting, March 7, Mrs. Weston testified that she heard loud voices and then a noise; minutes later defendant entered her apartment and said: 'Larry, Larry, I shot Blanche.' He then handed the gun to Larry and walked out stating: 'I'm going up to Lennie's' (Lennie is Mrs. Lillian Dickey, one of Blanche Tyrrell's sisters).

"Grace McWilliams, another of decedent's sisters, testified that on Sunday, March 6, . . . as they approached Blanche's home defendant said: 'Now I'm going to kill her, too.' 'You can send somebody down in the morning.'

"Chief Felker of the Portland Borough Police [after telling about the arguments between defendant and his wife and that] Blanche complained that defendant had pointed a gun at her; . . . Felker asked defendant about a revolver and Tyrrell replied that it was only a 'starter pistol' and shoots blanks. Felker then asked Tyrrell, 'How do you shoot squirrels with a starter pistol.' . . .

"Lillian Dickey testified that defendant came to her house about 10:00 a.m., on March 7 and asked to borrow a shotgun to shoot a squirrel. She loaned him the gun and he said that he would be finished with it in about 15 minutes. In a short period of time she heard what might have been a shot and two or three minutes later defendant came up the road and was asked if he shot the squirrel. He said: 'No, I missed it' and then asked to use the telephone. Tyrrell 'phoned the State Police and said: 'Send a couple of your boys down; I just shot my wife.' He then said to Mrs. Dickey: 'The whole thing's my fault. I can't stand this fighting any more. The whole thing—I did it and it's my fault.' "

Defendant's contention that he had no intent to take his wife's life rests on his own testimony at the trial, and on the opinion of Dr. Donald K. Coleman, a psychiatrist. Dr. Coleman testified that the defendant was a "simple schizophrenic" and that on the day in question, a declaration by his wife that "you are just a God damned crippled bum" so affected his mind that he would react to an impulse to pick up a loaded shotgun resting at his elbow and fire it at his wife. Expressed in other words, defendant's principal contention is that he borrowed the gun and the shell to shoot squirrels, and that he was so goaded and blinded by his wife's heartless insulting remark that he shot her without fully realizing whether he was shooting at her or over her head and without intending to kill her. He conveniently forgets (1) his prior threats to kill his wife, (2) several of his incriminating confessions, (3) that he admitted on cross-examination that shortly before the murder he said to his wife's sister Grace " 'If I had the guts I'd shoot Blanche,' or something pertaining to that", and (4) that actions often speak louder than words.

In *Commonwealth v. Nelson,* 396 Pa. 359, 362, 152 A. 2d 913, the Court pertinently said: " ' "Defendant, like most defendants, proceeds on the assumption that you must believe all of his statements or confessions; of course, that is erroneous; a jury can believe all or a part of or none of a defendant's statements, confessions or testimony . . ." ': Commonwealth v. Ballem, 386 Pa. 20, 26, 123 A. 2d 728; Commonwealth v. Donough, 377 Pa. 46, 50, 103 A. 2d 694; Commonwealth v. Homeyer, 373 Pa. 150, 153, 94 A. 2d 743."

A similar contention, viz., lack of the required criminal intent, was made by the defendant but rejected in *Commonwealth v. Hart,* 403 Pa. 652, 170 A. 2d 850, in *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861, and in *Commonwealth v. Stelma,* 327 Pa. 317, 192 A.

906.  In the *Hart* case, defendant was convicted of a felony murder, viz., a murder occurring during the course of a robbery.  He contended, inter alia, that he had no intent to commit a robbery, much less a murder, and that the robbery occurred and the intention to rob the victim arose, *after* the victim was dead.  Quoting with approval from *Commonwealth v. Kravitz* (400 Pa., supra, page 208), we said (pages 654-655):  " ' " . . . ' "It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt: [citing 10 recent cases]." ' " '

"If the law were otherwise it would be impossible in many cases where there were no eyewitnesses, to convict a criminal.  It is rare that a criminal ever discloses in advance or sends a telegram expressing his criminal intentions.

" 'The test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial—is whether accepting as true *all the evidence upon which, if believed,* the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged, i.e., the murder of Max Kravitz: [citing 11 prior decisions of this Court]' . . ." (page 201)

It is easy to understand, in the light of all the testimony, why the trial Judges did not believe defendant's transparently false testimony about shooting squirrels and his conflicting statements about the killing.  During the week after the murder defendant gave the district attorney and the police four written statements concerning the crime which in some important details differed widely.  In what the Court could have found were the most truthful statements, he said:

"On the morning of March the 7th, 1960, my wife and I were arguing.  I was fed up to the neck, as this

had been going on for several months, and I had the shot gun loaded, I just blew my top; picked up the shot gun, and fired it. She was standing in front of the TV set when I fired the gun, she raised her hands up to protect herself, then fell to the floor. . . .

"I knew the gun was loaded, as I had loaded it myself, I also knew that if I pulled the trigger that I could of hurt my wife. And when I fired the gun I did not fire it accidentally. . . .

"At this point, I had said nothing, just listened to her and getting madder. At this remark, I picked up the shotgun aimed it and pulled the trigger. She was standing over in front of the TV set at this time, I was standing by the door at the end of the snack bar. When I fired the gun, I was so mad, that I didn't know whether I was aiming at her over her head or where. I knew the gun was loaded as I had loaded it a few minutes before. And if I pulled the trigger, I could of hurt her and even killed her. But being so mad, I pulled the trigger anyway."

The Commonwealth has the burden of proving beyond a reasonable doubt that defendant committed the crime of which he was charged and found guilty. The evidence to justify a verdict of murder in the first degree was not only ample, it was overwhelming. A defendant's mind and intent cannot be photographed; often there are neither photographs nor eyewitnesses of the crime nor the identity of the criminal. A criminal's intent, like the commission of a crime and the identity of the criminal, can be found by a jury or Judge from a consideration of the defendant's act, his words and his actions—not only at the time of the commission of the crime but also, when relevant, prior and subsequent thereto—in other words, from all relevant facts and circumstances and all reasonable inferences therefrom.

This has long been recognized and realistically applied by the Courts. For centuries, even before Black-

stone, the law had established a number of well settled principles in order to protect society from death or injury by criminals. In *Commonwealth v. Nelson*, 396 Pa., supra, the Court, after quoting several cases, further said (pages 363-364):

"In Commonwealth v. Ballem, 386 Pa., supra, the Court said (page 26) '. . . Indeed, the jury could have found *a specific intent to kill* and therefore first degree murder from "the offender's use of a deadly weapon, for while an intention to kill may be shown by the defendant's express words or declarations or other conduct, such intent may be just as effectively inferred from the deliberate use of a deadly weapon upon a vital part for a manifest purpose: Commonwealth v. Iacobino, supra, . . . Commonwealth v. Troup, 302 Pa. 246, 253, 153 A. 337; Commonwealth v. Green, 294 Pa. 573, 584, 144 A. 743. . . .": Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d 317. See also to the same effect Commonwealth v. Heller, 369 Pa. 457, 87 A. 2d 287; Commonwealth v. Kelly, 333 Pa. 280, 4 A. 2d 805.' "

In *Commonwealth v. Sauders*, 390 Pa. 379, 134 A. 2d 890, the Court said (pages 387-388): " '. . . Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. ". . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt: Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820; Commonwealth v. Homeyer, 373 Pa. 150, 94 A. 2d 743; Commonwealth v. Lowry, 374 Pa. 594, 600, 98 A. 2d 733; Commonwealth v. Danz, 211 Pa. 507, 60 A. 1070; Commonwealth v. Wentzel, 360 Pa. 137, 61 A. 2d 309": Commonwealth ex rel. Garrison v. Burke, 378 Pa. 344, 348, 106 A. 2d 587.' " See, to the same effect, *Commonwealth v. Boden*, 399 Pa. 298, 159 A. 2d 894; *Commonwealth v. Kravitz*, 400 Pa., supra.

## Defendant's psychiatric evidence and the applicable Law

The lower Court on petition of defendant's counsel ordered an inquiry into the defendant's mental condition by two qualified psychiatrists, Charles W. Iobst, M.D., and John C. Lychak, M.D. Dr. Iobst examined the defendant on May 23, 1960, and Dr. Lychak examined him on May 31, 1960. Although written reports were submitted to the Court and to defendant's counsel, neither of these doctors was called to testify. Instead the defendant called Dr. Donald K. Coleman, who had examined the defendant on September 18, 1960, nine days before the first day of trial. Dr. Coleman testified that the defendant fell into the simple type of schizophrenia, which is an impairment in the emotional life but not in the intellectual life. He described his examination as "Listening to him, watching his mannerisms, watching his affect, his no sense of feeling when he described anything connected with love or death, his behavior, his running away pattern. His thinking was clear. He . . . showed no signs of intellect impairment. It was all in the emotional state . . . ."

As a result Dr. Coleman determined that the defendant was psychotic since teen age and that he was so emotionally upset on March 7, 1960, that "he would react to an impulse to pick up a loaded shotgun resting at his elbow and fire it at his wife, and that at that time he had no intent to take his wife's life."

The doctrine of "irresistible impulse" or in the modern psychiatric vernacular "inability to control one's self", whether used to denote legal insanity, or as a device to escape criminal responsibility for one's acts or to reduce the crime or its degree, has always been rejected in Pennsylvania. In *Commonwealth v. Neill*, 362 Pa. 507, 67 A. 2d 276, Mr. Chief Justice STERN said: "Apart from the fact that 'confusional in-

sanity' is apparently an antiquated and discarded theory and that the proposition that there could be such a thing as a momentary insanity was sharply challenged by an expert witness for the Commonwealth, it would seem quite obvious that defendant's witness failed to differentiate between a mere temporary frenzy or emotional excitation, and insanity within the legal meaning of that term, namely *inability, from disease of the mind,* * to understand the nature and quality of the act and to distinguish between right and wrong with respect to it: Commonwealth v. Szachewicz, 303 Pa. 410, 416, 417, 154 A. 483, 485; Commonwealth v. Lockard, 325 Pa. 56, 60, 188 A. 755, 757. . . . Certainly neither social maladjustment, *nor lack of self-control,* * nor impulsiveness, nor psycho-neurosis, nor emotional instability, nor chronic malaria, nor all of such conditions combined, constitute insanity within the criminal-law conception of that term."

In *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d 98, defendant shot and killed his adopted daughter; this Court affirmed his conviction of murder in the first degree. Three psychiatrists testified that defendant, at the time of the commission of the killing, was suffering from a paranoid psychosis, or from a delusion, or from a severe psychosis accompanied by serious delusions, or was a paranoid schizophrenic and at times did not know the difference between right and wrong and acted under an irresistible impulse and hence was insane. This Court, in a learned opinion by Mr. Justice EAGEN, analyzed at length and firmly rejected, as this Court had often previously done, the theory of irresistible impulse** as a defense in an in-

---

* Italics, ours.

** It is universally recognized that the M'Naghten Rule was created for the protection of society. It is the conviction of this writer that society would be almost completely unprotected from criminals if the law permitted a blind or irresistible impulse or in-

dictment for murder. Once again this Court approved the M'Naghten Rule,* which "was adopted as the law in Pennsylvania (Commonwealth v. Mosler, 4 Pa. 264 (1846)) and has become firmly established and imbedded in the body of the law of this Commonwealth ever since. [citing many cases, including the recent case of Commonwealth v. Novak, 395 Pa. 199, 150 A. 2d 102 (1959)]".

Defendant's psychiatrist did not testify that the defendant was insane. What he did say was that because defendant's wife frequently picked on him and just before the killing insulted or goaded him, defendant had an emotional impulse to kill her which he could not resist.* The language in *Commonwealth v. Heller,* 369 Pa., supra, is particularly apt (page 462): "Everything that defendant did both immediately before and immediately after he killed his wife shows that he was in perfect possession of his senses, and the

---

ability to control one's self, to excuse or justify a murder or to reduce it from first degree to second degree. In the times in which we are living nearly every normal adult human being has moments or hours or days or longer periods when he or she is depressed and disturbed with resultant emotional upset feelings and so-called blind impulses; and the young especially have many uncontrolled emotions every day which are euphemistically called irresistible impulses. The Courts of Justice should not abdicate their function and duty of determining criminal responsibility to the psychiatrist. In such event the test will differ not only with each psychiatrist but also with the prevailing psychiatric winds of the moment. "'. . . Only a short time ago that concept [of irresistible impulse] was emphatically presented as an example of the "uniform" opinion of psychiatrists on criminal responsibility; and yet today, "irresistible impulse" is rejected by most psychiatrists as unsound. . . .' [Professor] Hall, 'Psychiatry and Criminal Responsibility,' 65 Yale L. J. 761, 762 (1956):" *State of New Jersey v. Lucas,* 30 N. J. 37, 152 A. 2d 50.

* If marital nagging or insult is justification for homicide or even justification for the reduction of the degree of murder, there will in the future be few convictions of a married man.

jury [in this case, the Court] was well justified in not accepting his own statement that just for the few minutes required in which to perpetrate the killing he was mentally irresponsible and had no consciousness of what he was doing."

Since this is a murder case we have examined the record and all of the defendant's arguments with care. We find no merit in any of defendant's contentions. We are convinced that the lower Court was amply justified in its verdict and in the sentence it imposed.

Judgment affirmed.