## Commonwealth *v.* Carroll, Appellant.

526

Argued October 9, 1963. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Harold Gondelman,* with him *M. Barney Cohen,* for appellant.

*William Clancey Smith,* Assistant District Attorney, with him *George Ross,* Assistant District Attorney, and *Edward C. Boyle,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, November 12, 1963:

The defendant, Carroll, pleaded guilty generally to an indictment charging him with the murder of his wife, and was tried by a Judge without a jury in the Court of Oyer and Terminer of Allegheny County. That Court found him guilty of first degree murder and sentenced him to life imprisonment. Following argument and denial of motions in arrest of judgment and for a new trial, defendant took this appeal. The only questions involved are thus stated by the appellant:

(1) "Does not the evidence sustain a conviction no higher than murder in the second degree?"

(2) "Does not the evidence of defendant's good character, together with the testimony of medical experts, including the psychiatrist for the Behavior Clinic of Allegheny County, that the homicide was not premeditated or intentional, *require* * the Court below

---

* Italics throughout, ours.

to fix the degree of guilt of defendant no higher than murder in the second degree?"

. The defendant married the deceased in 1955, when he was serving in the Army in California. Subsequently he was stationed in Alabama, and later in Greenland. During the latter tour of duty, defendant's wife and two children lived with his parents in New Jersey. Because this arrangement proved incompatible, defendant returned to the United States on emergency leave in order to move his family to their own quarters. On his wife's insistence, defendant was forced first to secure a "compassionate transfer" back to the States, and subsequently to resign from the Army in July of 1960, by which time he had attained the rank of Chief Warrant Officer. Defendant was a hard worker, earned a substantial salary and bore a very good reputation among his neighbors.

In 1958, decedent-wife suffered a fractured skull while attempting to leave defendant's car in the course of an argument. Allegedly this contributed to her mental disorder which was later diagnosed as a schizoid personality type. In 1959 she underwent psychiatric treatment at the mental hygiene clinic in Aberdeen, Maryland. She complained of nervousness and told the examining doctor "I feel like hurting my children." This sentiment sometimes took the form of sadistic "discipline" toward their very young children. Nevertheless, upon her discharge from the clinic, the doctors considered her much improved. With this background we come to the immediate events of the crime.

. In January, 1962, defendant was selected to attend an electronics school in Winston-Salem, North Carolina, for nine days. His wife greeted this news with violent argument. Immediately prior to his departure for Winston-Salem, at the suggestion and request of his wife, he put a *loaded* .22 calibre pistol on the

window sill at the head of their common bed, so that she would feel safe. On the evening of January 16, 1962, defendant returned home and told his wife that he had been temporarily assigned to teach at a school in Chambersburg, which would necessitate his absence from home four nights out of seven for a ten week period. A violent and protracted argument ensued at the dinner table and continued until four o'clock in the morning.

Defendant's own statement after his arrest details the final moments before the crime: "We went into the bedroom a little before 3 o'clock on Wednesday morning where we continued to argue in short bursts. Generally she laid with her back to me facing the wall in bed and would just talk over her shoulder to me. I became angry and more angry especially what she was saying about my kids and myself, and sometime between 3 and 4 o'clock in the morning I remembered the gun on the window sill over my head. I think she had dozed off. *I reached up and grabbed the pistol and brought it down and shot her twice in the back of the head."* *

Defendant's testimony at the trial elaborated this theme. He started to think about the children, "seeing my older son's feet what happened to them. I could see the bruises on him and Michael's chin was split open, four stitches. I didn't know what to do. I wanted to help my boys. Sometime in there she said something in there, she called me some kind of name. I kept thinking of this. *During this time I either thought or felt—I thought of the gun, just thought of the gun.* I am not sure whether I felt my hand move toward the gun—I saw my hand move, the next thing— the only thing I can recollect after that is right after

---

* When pressed on cross-examination defendant approximated that five minutes elapsed between his wife's last remark and the shooting.

the shots or right during the shots I saw the gun in my hand just pointed at my wife's head. She was still lying on her back—I mean her side. I could smell the gunpowder and I could hear something—it sounded like running water. I didn't know what it was at first, didn't realize what I'd done at first. Then I smelled it. I smelled blood before. . . ." "Q. At the time you shot her, Donald, were you fully aware and intend to do what you did? A. I don't know positively. All I remember hearing was two shots and feeling myself go cold all of a sudden."

Shortly thereafter defendant wrapped his wife's body in a blanket, spread and sheets, tied them on with a piece of plastic clothesline and took her down to the cellar. He tried to clean up as well as he could. That night he took his wife's body, wrapped in a blanket with a rug over it to a desolate place near a trash dump. He then took the children to his parents' home in Magnolia, New Jersey. He was arrested the next Monday in Chambersburg where he had gone to his teaching assignment.

Although defendant's brief is voluminous, the narrow and only questions which he raises on this appeal are as hereinbefore quoted. Both are embodied in his contention that the crime amounted only to second degree murder and that his conviction should therefore be reduced to second degree or that a new trial should be granted.

The applicable principles of law are well settled, but because they are so frequently misunderstood or misapplied or overlooked, we deem it wise to restate them. Many of them are set forth and reaffirmed in *Commonwealth v. Gooslin,* 410 Pa. 285, 189 A. 2d 157, where the Court said (pages 286, 288, 289) :

". . . 'Murder in Pennsylvania was first authoritatively defined in the famous case of Commonwealth v. Drum, 58 Pa. 9, 15. *"Murder",* . . . *"is defined as an*

*unlawful killing of another with malice aforethought, express or implied."* The legislature divided murder into two classifications, murder in the first degree and murder in the second degree; and provided that (1) all murder perpetrated by poison or lying in wait; or by any other kind of wilful, deliberate [and] premeditated killing, or any murder which shall be committed in the perpetration of or attempt to perpetrate certain specified felonies [arson, rape, robbery, burglary, or kidnapping],* is murder in the first degree and (2) every other kind of murder is murder in the second degree: Act of June 24, 1939.*

" 'Malice express or implied is [the hallmark] the criterion and absolutely essential ingredient of murder. Malice in its legal sense exists not only where there is a particular ill will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Legal malice may be inferred and found from the attending circumstances. [Malice is present if the defendant had an intent to do the deceased serious bodily harm: Commonwealth v. Drum, supra; Commonwealth v. Dorazio, 365 Pa. 291, 74 A. 2d 125].

" ' "The test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial—is whether accepting as true all the evidence upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged, . . .: [citing numerous authorities].

" ' ". . . 'It has become customary for a defendant in his argument before an Appellate Court to base his claims and contentions upon his own testimony or that

---

* Also where death results from the malicious wrecking of a train. Act of June 24, 1939, P. L. 872, §919, 18 PS §4919.

"* P. L. 872, as amended, §701, 18 PS §4701."

of his witnesses even after a jury has found him guilty. This, of course, is basic error. After a plea or verdict of guilty, "we accept as true all of the Commonwealth's evidence upon which, if believed, the jury could have properly based its verdict: [citing numerous authorities]." ' " ' "

"In Commonwealth v. Kravitz, 400 Pa. 198, 161 A. 2d 861, the Court said (page 208) : ' ". . . '. . . Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. ". . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt: [citing numerous authorities]." ' " ' "

In *Commonwealth v. Tyrrell,* 405 Pa. 210, 174 A. 2d 852, the Court said (pages 212-213) : "The essential difference in a nonfelony murder-killing between murder in the first degree and murder in the second degree is that murder in the first degree requires a specific intent to take the life of another human being: Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Dorazio, 365 Pa., supra; Commonwealth v. Malone, 354 Pa., supra; Commonwealth v. Chapman, 359 Pa. 164, 58 A. 2d 433; Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d 317; Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823."

The specific intent to kill which is necessary to constitute in a nonfelony murder, murder in the first degree, may be found from a defendant's words or conduct or from the attendant circumstances together with all reasonable inferences therefrom, and may be inferred from the intentional use of a deadly weapon on a vital part of the body of another human being: *Commonwealth v. Tyrrell,* 405 Pa., supra; *Common-*

*wealth v. Moore,* 398 Pa. 198, 157 A. 2d 65; *Commonwealth v. Nelson,* 396 Pa. 359, 152 A. 2d 913; *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728; *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287; *Commonwealth v. Jones,* 355 Pa. 522, 50 A. 2d 317.

It is well settled that a jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness: *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728; *Commonwealth v. Tyrrell,* 405 Pa., supra; *Commonwealth v. Ballem,* 386 Pa., supra; *Commonwealth v. Donough,* 377 Pa. 46, 50, 103 A. 2d 694; *Commonwealth v. Homeyer,* 373 Pa. 150, 153, 94 A. 2d 743; *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455; *Commonwealth v. Shults,* 221 Pa. 466, 70 Atl. 823.

If we consider only the evidence which is favorable to the Commonwealth, it is without the slightest doubt sufficient in law to prove first degree. However, even if we believe all of defendant's statements and testimony, there is no doubt that this killing constituted murder in the first degree. Defendant first urges that there was insufficient time for premeditation in the light of his good reputation. This is based on an isolated and oft repeated statement in *Commonwealth v. Drum,* 58 Pa. 9, 16, that " 'no time is too short for a wicked man to frame in his mind his scheme of murder.' " Defendant argues that, conversely, a long time is necessary to find premeditation in a "good man." We find no merit in defendant's analogy or contention. As Chief Justice MAXEY appropriately and correctly said in *Commonwealth v. Earnest,* 342 Pa. 544, 21 A. 2d 38 (pages 549-550) : "Whether the intention to kill and the killing, that is, the premeditation and the fatal act, were within a brief space of time or a long space of time is immaterial if the killing was in fact intentional, wilful, deliberate and premeditated. . . . As Justice AGNEW said in Com. v. Drum : 'The law fixes up-

on no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in the evidence.' "

Defendant further contends that the time and place of the crime, the enormous difficulty of removing and concealing the body, and the obvious lack of an escape plan, militate against and make a finding of premeditation legally impossible. This is a "jury argument"; it is clear as crystal that such circumstances do not negate premeditation. This contention of defendant is likewise clearly devoid of merit.

Defendant's most earnestly pressed contention is that the *psychiatrist's opinion* of what *defendant's state of mind must have been and was at the time of the crime,* clearly establishes not only the lack but also the legal impossibility of premeditation. Dr. Davis, a psychiatrist of the Allegheny County Behavior Clinic, testified that defendant was "for a number of years . . . passively going along with a situation which he . . . [was] not controlling and he . . . [was] not making any decisions, and finally a decision . . . [was] forced on him . . . . He had left the military to take this assignment, and he was averaging about nine thousand a year; he had a good job. He knew that if he didn't accept this teaching assignment in all probability he would be dismissed from the Government service, and at his age and his special training he didn't know whether he would be able to find employment. More critical to that was the fact that at this point, as we understand it, his wife issued an ultimatum that if he went and gave this training course she would leave him . . . . He was so dependent upon her he didn't want her to leave. He couldn't make up his mind what to do. He was trapped. . . ."

The doctor then gave *his opinion* that "rage", "desperation", and "panic" produced "an impulsive auto-

matic reflex type of homicide, . . . as opposed to an intentional premeditated type of homicide. . . . Our feeling was that if this gun had fallen to the floor he wouldn't have been able to pick it up and consummate that homicide. And I think if he had to load the gun he wouldn't have done it. This is a matter of opinion, but this is our opinion about it."

There are three answers to this contention. First, as we have hereinbefore stated, neither a Judge nor a jury has to believe all or any part of the testimony of the defendant or of any witness. Secondly, the opinion of the psychiatrists was based to a large extent upon statements made to them by the defendant, which need not be believed and which are in some instances opposed by the facts themselves. Thirdly, a psychiatrist's opinion of a defendant's impulse or lack of intent or state of mind is, in this class of case, entitled to very little weight, and this is especially so when defendant's own actions, or his testimony or confession, or the facts themselves, belie the opinion.

The rule regarding the weight of expert testimony in this class of case is well settled. ". . . '[E]xpert testimony is entitled to little weight as against positive facts. Expert medical opinions are especially entitled to little or no weight when based upon insufficient or (partly) erroneous facts or a feigned state of mind or an inaccurate past history, or upon unreasonable deductions, . . .' [Commonwealth v. Gossard, 385 Pa. 312, 123 A. 2d 258; Commonwealth v. Patskin, 375 Pa. 368, 375, 100 A. 2d 472]." *Commonwealth v. Jordon*, 407 Pa. 575, 583, 181 A. 2d 310.

In *Commonwealth v. Woodhouse*, 401 Pa. 242, 164 A. 2d 98, we held that the jury *was free to disregard expert psychiatric testimony that defendant was insane at the time of commission of the killing,—which would have acquitted the defendant under the M'Naghten Rule*—in the face of testimony by lay witnesses

who actually observed him and considered him to be sane at times when he was allegedly insane. Mr. Justice EAGEN, speaking for the Court, said (pages 259-260) : ". . . '. . . It must be kept in mind that an opinion is only an opinion. It creates no fact. Because of this, opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts such as statements by the defendant and observations of his actions.' " . See to the same effect: *Commonwealth v. Melton*, 406 Pa., supra; *Commonwealth v. Heller*, 369 Pa., supra.

Defendant's *own statement* after his arrest, upon which his counsel so strongly relies, *as well as his testimony at his trial*, clearly convict him of first degree murder and justify the finding and sentence of the Court below. Defendant himself described his actions at the time he killed his wife. From his own statements and from his own testimony, it is clear that, terribly provoked by his allegedly nagging, belligerent and sadistic wife,* *defendant remembered the gun, deliberately took it down, and deliberately fired two shots into the head of his sleeping wife.* There is no doubt that this was a wilful, deliberate and premeditated murder.

While defendant makes no contention that he was insane at the commission of the murder or at any time, what this Court said in *Commonwealth v. Tyrrell*, 405 Pa., supra (pages 220-221)** is equally appropriate here: "Defendant's psychiatrist did not testify that the defendant was insane. What he did say was that because defendant's wife frequently picked on him and just before the killing insulted or goaded him, defend-

---

* While this picture of his wife is different from that depicted by her neighbors, if defendant's version is true, the remedy lies in a commutation by the Board of Pardons and not by a disregard of the law by the Courts.

** In the body of the Opinion and in the footnote.

ant had an emotional impulse to kill her which he could not resist.

". . . *society would be almost completely unprotected from criminals if the law permitted a blind or irresistible impulse or inability to control one's self, to excuse or justify a murder or to reduce it from first degree to second degree.* In the times in which we are living nearly every normal adult human being has moments or hours or days or longer periods when he or she is depressed and disturbed with resultant emotional upset feelings and so-called blind impulses; and the young especially have many uncontrolled emotions every day which are euphemistically called irresistible impulses. *The Courts of Justice should not abdicate their function and duty of determining criminal responsibility to the psychiatrist.* In such event, the test will differ not only with each psychiatrist but also with the prevailing psychiatric winds of the moment. ' ". . . Only a short time ago that concept [of irresistible impulse] was emphatically presented as an example of the 'uniform' opinion of psychiatrists on criminal responsibility; and yet today, 'irresistible impulse' is rejected by most psychiatrists as unsound . . . ." [Professor] Hall, "Psychiatry and Criminal Responsibility", 65 Yale L.J. 761, 762 (1956);' State of New Jersey v. Lucas, 30 N.J. 37, 152 A. 2d 50."

Just as the Courts cannot abdicate to the psychiatrists the task of determining criminal responsibility in law, so also they cannot remit to psychiatrists the right to determine the intent or the state of mind of an accused at the time of the commission of a homicide.

Since this is a case of murder, we have carefully reviewed the record.* It is crystal clear, from the rec-

---

* As required by the Act of February 15, 1870, P. L. 15, 19 PS §1187.

ord, that defendant was justifiably convicted of murder in the first degree.

Judgment and sentence affirmed.

Mr. Justice BENJAMIN R. JONES and Mr. Justice COHEN concur in the result.