Commonwealth *v.* Howard, Appellant.

306

Argued March 16, 1967.   Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*H. David Rothman,* Trial Defender, with him *George H. Ross,* Public Defender, for appellant.

*Edwin J. Martin,* Assistant District Attorney, with him *Charles B. Watkins,* Assistant District Attorney, and *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, July 25, 1967:

On April 11, 1966, appellant, Stanley Howard, with the advice of counsel, entered a plea of guilty generally to an indictment for murder in the death of Clifford Grogan. After a hearing, wherein extensive testimony was taken and documentary evidence was reviewed, the court en banc fixed the degree of guilt as murder in the first degree and imposed the death penalty. The appellant filed a motion in arrest of judgment and, after submission of briefs and oral argument, the court, on October 25, 1966, by its opinion and order, denied the motion. On November 2, 1966, the death sentence was formally announced in open court, where appellant, with counsel, was present. This appeal followed.

On November 12, 1965, at approximately 3:30 P.M., Lorance J. Weyandt, a lieutenant of the guards, was standing in the yard of the Western State Correctional Institution at Pittsburgh conversing with another guard, John Fred Walz. Suddenly and without warning, someone came up behind Weyandt, and he received what he described as "a hard blow in the back". He wheeled around and confronted Stanley Howard, the appellant, who was then an inmate at that institution. Howard was facing him with a knife in his right hand. Howard advanced toward Weyandt, and Weyandt began backing away. Howard then swung the knife and, with a sweeping motion, struck the officer in the chest. Walz ran over to assist Weyandt and the appellant, Howard, turned upon him, cursing, and shouted "Do you want it too?". Walz ran to obtain assistance. Weyandt continued backing away, holding his hands in front of him. At this point, tradesmen instructor

Clifford Grogan came on the scene and approached Howard from behind. Just before Grogan was able to seize the appellant, Howard spun sideways and struck at Grogan with the knife. Grogan jumped backward, attempting to avoid the thrust, and in doing so, fell to the ground. He kicked out at the appellant and in the same motion rolled over onto his right side. Appellant, Howard, thereupon stabbed Grogan in the left side. Howard then stepped over his victim in a straddling position and, while Grogan was on his hands and knees and Howard was straddling him across the hips, Howard proceeded to stab Grogan twice in the right side.

By this time, other guards rushed to the scene and Howard was seized, subdued, and disarmed. It was at this point that Weyandt discovered that the blow which he had felt in his back had been a stab wound inflicted by the appellant. Weyandt recovered from this stab wound, but Grogan died shortly thereafter from the stab wounds which he had received.

Interrogation of Weyandt at trial revealed that he had had no personal contact with the appellant which would have resulted in any animosity between them. Officer Weyandt further indicated at the trial that from the time he felt the pain in his back until he saw Grogan attempting to restrain Howard was only a matter of seconds. Weyandt further indicated at the preliminary hearing that the demeanor of the appellant was that of someone who was mad or angry. There is no evidence to indicate that Grogan was ever known by Howard.

The history of Stanley Howard is very well covered by the court below as follows:

"Stanley Howard was born on May 18, 1939, in New Jersey, the youngest of six children. In November, 1943, following the breakup of his parents' marriage, he was placed in a foster home, under the care

of a Mrs. Halsey. In January, 1944, Mrs. Halsey reported that he was 'misbehaving' and that she could not handle him, and he was therefore placed with a Mrs. Gilbert. In October, 1947, it is reported that Howard was stealing from Mrs. Gilbert's grandson. In December, 1948, Howard was reported annoying an elderly man on the way to school. In February, 1949, he is reported to have been a school problem, and in July, 1949, he climbed out of a school bus and ran away. In August, 1949, he was reported to have been dumping garbage cans into the hallways of apartment buildings adjacent to his own. By the end of 1949, Mrs. Gilbert reported that he was constantly staying out late and running around and that she was unable to handle him. In January, 1950, he was placed in the home of a Mrs. Ford. She reported that he lied to her as to his activities, stayed out late, and was a disciplinary problem.

"In April, 1950, he was placed in the home of a Mrs. Dumas. On July 10, 1950, he broke the window of a bakery shop, and on October 24, 1950, he broke a number of windows at school. Finally, in October, 1951, Mrs. Dumas reported that Howard had run away for a week-end, had committed thefts from her, and that she was unable to control him. On November 1, 1951, a Juvenile Court hearing was held, involving the thefts from Mrs. Dumas. Howard was placed on one year's probation and placed in an institutional home. He was, at this time, 12 years old.

"In January, 1952, he was placed with his mother, who it appears, was living in Philadelphia in an adulterous relationship.

"Within a relatively short time, Howard was arrested for aggravated assault and battery, and sent to the Glen Mills School. He adjusted poorly at Glen Mills, and was transferred to the State Correctional Institution at Camp Hill in 1954, where he remained

until 1958. He returned to living with his mother until 1960 when he enlisted in the Army.

"While in the service, he was court-martialed four times and was given an undesirable discharge in August, 1961. He once again returned to Philadelphia and resided with his mother.

"In April, 1962, Howard was convicted of aggravated assault and battery and sentenced to 6 to 22 months. On October 14, 1962, he was paroled.

"On November 3, 1962, he broke into a home in Philadelphia, stole money and jewelry, and raped the woman occupant. The victim's husband returned while Howard was still present, and a struggle ensued, with Howard inflicting a cutting upon the husband and escaping.

"On November 23, 1962, he robbed a grocery store and physically assaulted the woman proprietor with his fists.

"On December 15, 1962, and again on December 22, 1962, he committed robberies while armed with a rifle, and on December 25, 1962, he robbed a taproom while armed with a shotgun.

"Howard was apprehended on December 26, 1962. He pleaded guilty and, following a hearing on February 14, 1963, was sentenced to a total of 30 to 60 years in prison.

"He was sent initially to the State Correctional Institution at Graterford. His record there indicates a number of disciplinary offenses. In June, 1964, he was twice admitted to the hospital following apparent suicide attempts, once by cutting his forearms and the other by attempted hanging by his bedsheet.

"He was transferred to the Eastern State Correctional Institution at Philadelphia on July 14, 1964. On August 25, 1965, Howard attacked an inmate named Murphy with a knife, for which he was tried and received an additional 1 to 2 year sentence. As a result

of this attack, he was transferred to the State Correctional Institution at Pittsburgh on March 31, 1965.

"Upon reception at the State Correctional Institution at Pittsburgh, he was placed in administrative segregation for observation and thereafter was released into the general prison population on May 3, 1965.

"On July 2, 1965, he was charged with refusing to be searched and threatening an officer, and as a result was returned to administrative segregation. On July 9, 1965, while confined to segregation, he attacked an inmate named Joseph Weaver with a lock wrapped in a sock, as a result of which Weaver was hospitalized, and Howard was placed in punitive segregation. He was finally released from segregation on November 8, 1965. Four days later, on November 12, 1965, the attack upon Weyandt and the killing of Grogan occurred.

"On February 21, 1966, Howard physically attacked his court-appointed attorney who was in the process of consulting with Howard in his cell."

The court below, in its opinion, discusses the psychiatric evaluation of the appellant upon his arrival at the Eastern State Correctional Institution, where he was examined by Dr. Melvin S. Heller, a psychiatrist. Dr. Heller classified appellant's problem as "a long-standing character disorder of the dissocial type, manifested by a long history of anti-social behavior, inability to profit from experience, and a lack of capacity to form meaningful emotional relationships." In spite of appellant's record of suicidal attempts at Graterford, Dr. Heller was of the opinion that appellant did not present a significant suicide risk and recommended that he be placed in the prison population. Dr. Heller's second report on October 1, 1964, followed an apparent suicide attempt. At that time, he stated: "It would appear that this suicidal attempt was a superficial one, as was the original one he made

at Graterford . . .". At this time, Dr. Heller reiterated his previous evaluation of Howard and found him unable to respond to disciplinary relationship except for the briefest periods of time. On October 20, 1964, appellant was examined by Dr. C. Fred Hering, a psychiatrist, following an episode of bizarre behavior and a suicidal attempt on October 2, 1964, supposedly a severe reaction to the long sentence which had been imposed. Dr. Hering stated: "This man was admitted to 3 Block . . . following an episode of bizzarre [sic] behavior on 15 Block, where he had been sent following a suicidal attempt. . . . This seemed to be a very severe reaction to the fact that he had a 30 to 60 year sentence and feels he has nothing to lose. However, it was pointed out to him that he has a lot to gain with behavior which would be more productive and constructive for him; that there is an opportunity for him to learn many things, both about himself as well as vocationally and educationally, here in the institution. He seems somewhat impressed by this."

The instant killing occurred on November 12, 1965. However, appellant was not indicted until December of 1965, and early in January of 1966, he was brought to court for the appointment of public counsel or the opportunity to obtain private counsel. On January 17, 1966, he corresponded with the newly-created office of the Public Defender, requesting counsel, and counsel was formally appointed on February 1, 1966. On February 21, 1966, upon the application of the office of the public defender, Dr. Emil Trellis, a psychiatrist, and Dr. Leon I. Ford, a clinical psychologist, were appointed to examine appellant. On March 5, 1966, Dr. Ford examined the appellant for approximately 4 hours. This examination included testing and an interview with appellant at great length. Dr. Ford observed: ". . . He seems equally inclined to take direct action, often in an impulsive manner, to avoid or to

obtain release from tension. Most of the time he reacts on a reality basis, but he has the potential for sudden emotional eruptions on the basis of inner promptings with little regard for external reality. . . . When his defenses are lowered under great stress he can be overwhelmed by intense mixed moody and angry feelings and destructive impulses. . . .

"Psychological tests reveal Mr. Howard to be extremely immature and self-centered person who views the world as extremely hostile and unpleasant. He has many deep-seated fears and conflicts and an extremely low tolerance for frustration and anxiety. Passivity, fantasy, projection and counter-phobic defenses are insufficient to contain his anxiety, and he avoids and relieves tension by direct and often impulsive action. Assultive [sic] tendencies are easily elicited especially when he feels threatened. Generally, he is quite reality oriented, but he has occasional lapses when his thinking is illogical and disordered."

He concluded as follows: "The eneuresis (bed-wetting), anti-social behavior, impulsive assaultiveness towards self and others, and the psychological test results indicating emotional conflicts, illogical thinking and the potential for impulsive behavior with little regard for reality all suggest a borderline psychosis or transient psychotic episodes in an impulsive character disordered personality."

In his direct examination at trial, Dr. Ford described appellant as thinking concretely, meaning that he attempted to act to immediate things instead of stopping to think what the consequences of such acts might be. He indicated that Howard had inadequate counter-phobic defenses, indicating that appellant tended to become more aggressive to counteract his fears. The suggestion of transient psychotic episodes was supported by the effects upon appellant of his being isolated and the occasional lapses which occurred in the

process of psychological testing. Dr. Ford's testimony also revealed, in his opinion, it would have been better had appellant been tested soon after the crime, depending upon his condition, and that it would have been worth the attempt to try to determine appellant's state of mind at the time the offense was committed.

In direct examination, Dr. Ford defined "psychosis" as follows: "Psychosis, generally speaking, is a condition in which the person is emotionally disturbed. In other words, they don't react to things as other people do. They might see a situation differently than other people see a situation. . . . They might react in such a way that it is entirely unrealistic, . . ."

As to "transient psychotic episodes", Dr. Ford explained: "By this I mean that under great stress a person can go into one of these psychotic episodes. It doesn't mean that they are like this all the time. It would happen when they are under particular kinds of stress. . . . It can be inner stress. It could be external, it could be inner, it could be both."

Dr. Ford classified appellant as a sociopathic personality, defined as follows: "The sociopathic personality essentially is someone who from very early in life has had very few, if any, close personal relationships with people of longlasting nature, and as a result they tend to be very shallow, very superficial in the way they form friendships. They are really too immature socially and emotionally to really form friendships, real friendships, as most people do. They, of course, seem to be self-centered and primarily concerned with self-preservation and frequently may get into all sorts of difficulties with the law and with people in managing to survive as the only way they know how. They haven't been disciplined enough as children and really never developed a strong conscience, as the average person does who has more stable family relationships. Essentially, that's about it . . ."

Dr. Ford went on to state that sociopaths do not normally adjust well to long periods of confinement, and that possibly long periods of confinement could lead to further anti-social acts. He stated that sociopathic personalities are mentally ill, and that in his opinion, Stanley Howard was mentally ill. When questioned as to his being treated for his illness, he replied: "That's a difficult question. People have been trying to treat sociopaths and people who are mentally ill like Stanley for many years, with some success and with some failures. I would say more failures than successes."

Dr. Emil Trellis first examined Stanley Howard on March 3, 1966, and again on April 1, 1966. His testimony revealed that he had studied the tests given to Howard by Dr. Ford, and after examining Howard's tests, diagnosed him as "emotionally unstable personality with schizoid features. . . ". He quoted the definition of Emotionally Unstable Personality from the Diagnostic and Statistic Manual of the American Psychiatric Association as follows: "In such cases the individual reacts with excitability and ineffectiveness when confronted by minor stress. His judgment may be undependable under stress, and his relationship to other people is continuously fraught with fluctuating emotional attitudes, because of strong and poorly controlled hostility, guilt, and anxiety.

"This term is synonymous with the former term psychopathic personality with emotional instability."

He found that Howard showed hints of schizophrenic features, although Howard was not schizophrenic. He testified that the sociopathic person "tends to be impulsive; hence not to be able to have the judgment or control of impulses to delay immediate action with the idea that they have to have consequences for their behavior. The sociopath does not readily learn from experience. The sociopath in general isn't able

to have the controls to develop a sustained kind of occupational skill in many cases." Dr. Trellis also stated that, in his opinion, Howard was not legally insane.

We said in *Commonwealth v. Green,* 396 Pa. 137, 151 A. 2d 241 (1959) : "Our scope of review is limited: we simply determine whether the court below in its imposition of the death penalty upon Green abused its discretion.

"In Com. v. Taranow, 359 Pa. 342, 344, 345, 59 A. 2d 53, this Court, speaking through Mr. Justice (now Chief Justice) JONES, stated: 'The Act of 1939, supra, specifically provides that "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, *at its discretion,* impose sentence of death or imprisonment for life". (Emphasis supplied). The extent of our function in the premises is merely to review for a possible abuse of the discretion so reposed in the trial court: Commonwealth v. Hough, 358 Pa. 247, 250, 56 A. 2d 84. "The point for consideration [on appeal] is not whether this Court would have imposed the death penalty but whether the discretion vested in the court below was judicially exercised, . . ." Commonwealth v. Howell, 338 Pa. 577, 580, 13 A. 2d 531.' "

As we said in *Commonwealth v. Cater,* 402 Pa. 48, 55, 166 A. 2d 44 (1960) : "In determining whether the court below abused its discretion in the imposition of the death sentences we must bear in mind that while the discretion exercised by a trial court in the imposition of the death penalty, after a plea of guilty and a finding of murder in the first degree, is subject to our appellate review, yet on such review the question before us is not whether we would have imposed the same penalty under the circumstances but whether the trial court manifestly abused the discretion imposed upon it by the legislature: [citing cases] :"

In the instant case, appellant contends that the evidence was insufficient to establish that this was a killing with premeditation and deliberation. We believe this contention to be without merit. The appellant entered a plea of guilty to murder generally, and after the three-judge court heard all the evidence, the crime was fixed at murder in the first degree, and appellant was sentenced to death. The Penal Code of 1939, Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701 provides: "Offenses Against the Person. Section 701. Murder of the First and Second Degree.—All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, . . . shall be murder in the first degree. All other kinds of murder shall be murder in the second degree."

We said, in *Commonwealth v. Tyrrell*, 405 Pa. 210, 212, 174 A. 2d 852 (1961): "The distinguishing criterion or hallmark of murder is legal malice, express or implied. Malice is an absolutely essential ingredient of murder. [citing cases] The essential difference in a nonfelony murder-killing between murder in the first degree and murder in the second degree is that murder in the first degree requires a specific intent to take the life of another human being: [citing cases]."

In *Commonwealth v. Ballem*, 386 Pa. 20, 26, 123 A. 2d 728 (1956), we said: "Indeed, the jury could have found a specific intent to kill and therefore first degree murder from 'the offender's use of a deadly weapon, for while an intention to kill may be shown by the defendant's express words or declarations or other conduct, such intent may be just as effectively inferred from the deliberate use of a deadly weapon upon a vital part for a manifest purpose: [citing cases].' "

In the instant case, appellant's use of a deadly weapon and his acts, committed in the presence of others, were more than sufficient for the court to find

appellant guilty of murder in the first degree. The action of appellant supplies specific intent, willfulness, deliberation and premeditation essential for a determination of murder in the first degree. For example, in *Commonwealth v. Millien,* 291 Pa. 291, 295, 139 A. 851 (1927), it was held to be proper to admit evidence showing the number of shots fired by the defendant. As we said in *Commonwealth v. Tyrrell,* supra, "A criminal's intent, like the commission of a crime and the identity of the criminal, can be found by a jury or Judge from a consideration of the defendant's act, his words and his actions—not only at the time of the commission of the crime but also, when relevant, prior and subsequent thereto—in other words, from all relevant facts and circumstances and all reasonable inferences therefrom." In *Commonwealth v. Carroll,* 412 Pa. 525, 532, 194 A. 2d 911 (1963), this court, speaking through Mr. Chief Justice BELL, stated: "The specific intent to kill which is necessary to constitute in a nonfelony murder, murder in the first degree, may be found from a defendant's words or conduct or from the attendant circumstances together with all reasonable inferences therefrom, and may be inferred from the intentional use of a deadly weapon on a vital part of the body of another human being: [citing cases]."

In the instant case, where appellant made an unprovoked attack from the rear with a deadly weapon on a vital area of a prison guard; where he continued to strike at the unarmed guard with the weapon; and where he stabbed to death another unarmed man who was attempting to assist the guard, we find that the trial court was fully justified in making a finding of first degree murder.

Appellant further contends that the death penalty is not justified because of appellant's history, which has been set out previously, and particularly because an exhaustive inquiry was precluded by the failure of

the prison authorities to give appellant a mental examination immediately after the offense. Appellant further contends that this failure to give him a prompt medical examination was a denial of his constitutional right to the effective assistance of counsel, and prevented an effective inquiry into the defense of insanity. We find these contentions also to be without merit. We are aware that the psychiatrist and psychologist who testified on behalf of appellant both indicated it would have been desirable had appellant received an earlier mental examination; that is, shortly after the time the crime was committed. We are of the opinion that this would have been a desirable thing, and perhaps had the prison authorities had it to do over again, would have had such a mental examination conducted. However, we do not find that their failure to do so supports the contention as set forth by appellant. Nor do we find it mandatory that a defendant be given a mental examination on the spot. As we said in *Commonwealth v. Melton*, 406 Pa. 343, 356, 178 A. 2d 728 (1962): "The reports and opinions of psychiatrists and psychologists should be considered by the trial Court, together with all the other facts and evidence, but such reports and opinions are in no way controlling, and neither a jury nor a trial Court has to believe or give complete credence or any credence whatever to the opinion of the psychologists and of psychiatrists: [citing cases]."

Appellant's last contention is that the court's imposition of the death sentence was an abuse of discretion because the record disclosed appellant's mental illness at the time of the offense and for some time prior thereto, and that the imposition of this death sentence would constitute a cruel and unusual punishment in violation of the Federal and State Constitutions. We find this contention to be without merit. As we said in *Commonwealth v. Smith*, 405 Pa. 456, 459,

176 A. 2d 619 (1962): "This Court has sustained a verdict of first degree murder with penalty of death where defendant allegedly had an irresistible impulse, was a moron or a mental defective or a sexual pervert or a psychopathic personality, or had been previously confined in the hospital for the criminal insane for 14 years, or was a schizophrenic psychopath or was an unstable, mentally defective moron, or was feeble-minded: [citing cases]." We conclude, therefore, that appellant in the instant case received a fair hearing; that the evidence was more than sufficient for the court below to find appellant guilty of murder in the first degree. We further find the court below did properly and most thoroughly consider appellant's background, and that background, coupled with the testimony of both the psychiatrist and psychologist, was considered most properly by the court below in reaching its decision. We further find that under the scope of our review as has been previously set forth, the court below did not abuse its discretion in finding appellant guilty of murder in the first degree and in sentencing him to death.

Judgment affirmed.

Mr. Justice JONES concurs in the result.

DISSENTING OPINION BY MR. JUSTICE COHEN:

I dissent from the imposition of the death sentence and its affirmance by this Court. See my dissent in *Commonwealth v. Ahearn,* 421 Pa. 311, 218 A. 2d 561 (1966), and the opinion of Judge BREITEL of the New York Court of Appeals in *People v. Moseley,* 20 N.Y. 2d 64, 281 N.Y.S. 2d 762 (1967).

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I continue to adhere to the views expressed last year in my dissenting opinion in *Commonwealth v.*

*Ahearn,* 421 Pa. 311, 331, 218 A. 2d 561, 571 (1966),[1] and would, consistent with those views, vacate the instant judgment and remand so that the court below could consider the psychiatric testimony as it relates to the degree of guilt.[2]

In *Ahearn,* the majority opinion conceded that psychiatric testimony was both admissible and relevant for the purpose of determining penalty following a finding of murder in the first degree.[3] Thus, even if I were able to accept the rationale of *Ahearn,* I believe, in view of the psychiatric findings of both the majority of this Court and of the en banc court below, the imposition of the death penalty is improper in this case. Accordingly, I would exercise our authority under the Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701,

---

[1] Interestingly the majority opinion does not even cite *Ahearn.* Yet there can be no question that that decision, as both the appellant and appellee recognize, is crucial to the disposition of the instant case.

[2] A recent note in 71 Dick. L. Rev. 100 (1966) characterizes the *Ahearn* holding as having "disregarded modern enlightened authority and unwisely restricted the purpose for which psychiatric testimony may be admitted into evidence." Not only does this note, in my view, demonstrate the truth of its principal thesis but it also convincingly shows that *Ahearn* represents a new development in the law of Pennsylvania, for "while prior decisions have held that neither judge nor jury is to be controlled by psychiatric testimony, and that such testimony is to be accorded little weight, no prior Pennsylvania case has ever held that such testimony is inadmissible to show a lack of the elements necessary to establish murder in the first degree." Id. at 104.

I continue to believe that the most realistic rule devised to deal with this problem is that of The American Law Institute: "Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense." A.L.I. Model Penal Code, §4.02(1) (Official Draft, 1962). See also *People v. Gorshen,* 51 Cal. 2d 716, 726-27, 336 P. 2d 492, 498-99 (1959).

[3] 421 Pa. at 325, 218 A. 2d at 568.

and instruct the court below to sentence Howard to life imprisonment. See *Commonwealth v. Green,* 396 Pa. 137, 144-46, 151 A. 2d 241, 245 (1959).

Appellant concedes that under the M'Naghten Rule, which is the current test for criminal responsibility in Pennsylvania, he is guilty of murder.[4] And given *Ahearn,* the court below properly found him guilty of murder in the first degree. But the M'Naghten Rule is *totally irrelevant* to the question of whether or not the death sentence ought to be imposed in a given case. Indeed by not holding that the imposition of the death penalty, despite the existence of a serious mental disease or defect, amounts to an abuse of discretion, we are ignoring the teachings of *Commonwealth v. Green,* supra at 148, 150, 151 A. 2d at 246-47, 248 (emphasis supplied) : "No more awesome duty nor solemn obligation comes within the province of a judge than the decision whether penalty of death or life imprisonment shall be imposed upon a convicted first degree murderer. There is no rule that requires proof of mitigating or extenuating circumstances to reduce the penalty from death to that of life imprisonment. The imposition of the death penalty by a judicial tribunal should be made *only* when it is the *sole penalty justified both* by the criminal act and the *criminal himself* and then only after a full and exhaustive inquiry into both the criminal act and the criminal himself.

. . .

"An appropriate exercise of judicial discretion as required by the statute contemplates that the death penalty be imposed where *all* the facts surrounding the criminal act *and the criminal actor* have been exhaus-

---

[4] In my view the entire area of criminal responsibility could benefit from a fresh review by the judiciary. See, e.g., *United States v. Freeman,* 357 F. 2d 606 (2d Cir. 1966) (adopting the A.L.I. Model Penal Code test of legal insanity). I believe this to be a step in the right direction.

tively considered and where, after such consideration, *no other conclusion can be justified* than the extermination of the convicted criminal by death. Determination of the appropriate penalty arrived at in any other manner constitutes an abuse of the judicial discretion."

The court below was aware of the *Green* principle but concluded that, in view of certain aggravating factors,[5] Howard's mental condition did not justify imposing a life sentence. Although the court below did not specifically refer to the M'Naghten test, it did seem to feel that it was bound by it on sentencing as well as in determining the degree of guilt, for it held that under Pennsylvania law "the mere presence of mental disease or defect, not amounting to such impairment that the murderer did not know the difference between right and wrong, will not prevent the finding of murder in the first degree or the imposition of the death penalty."[6] But as I have already stated M'Naghten is

[5] These aggravating factors were: (1) the murder was committed by a convict already serving a long prison sentence; (2) the defendant had previously been convicted of felonies involving the use of violence; (3) at the time the murder was committed the defendant also caused serious bodily injury to another person. At the same time, however, the court recognized Howard's serious mental incapacity prevented him from fully controlling his responses.

[6] The court below felt that the above conclusion was necessitated by certain language from *Commonwealth v. Smith*, 405 Pa. 456, 459, 176 A. 2d 619, 620 (1962), to wit: "This Court has sustained a verdict of first degree murder with penalty of death where defendant allegedly had an irresistible impulse, was a moron or a mental defective or a sexual pervert or a psychopathic personality, or had been previously confined in the hospital for the criminal insane for 14 years, or was a schizophrenic psychopath or was an unstable, mentally defective moron, or was feeble-minded. [Citations omitted]." Each case must be decided on its own facts and the mere existence of psychiatric evidence tending to show the existence of a mental disease or defect is not sufficient to preclude the imposition of the death penalty. Most, if not all,

a test for determining criminal responsibility, not the appropriate penalty.

I dissent.

---

of the cases cited in the *Smith* opinion are distinguishable either because of the quantum of psychiatric testimony and/or because, as in *Smith*, a jury rather than a judge had determined the penalty. In the latter circumstances, this Court may not reverse the sentence for an abuse of discretion. See *Commonwealth v. Taranow*, 359 Pa. 342, 344-45, 59 A. 2d 53, 54 (1948). Nevertheless, in light of current medical knowledge, I cannot subscribe to the broad implications drawn by the court below from *Smith's* sweeping statement.