J-S32006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| NEFTALI VELAZQUEZ | : | |
| | : | |
| Appellant | : | No. 3084 EDA 2016 |

Appeal from the Judgment of Sentence January 25, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0010833-2013


BEFORE:   GANTMAN, P.J., STABILE, J., and FITZGERALD, J.*

MEMORANDUM BY GANTMAN, P.J.:                      **FILED JUNE 20, 2017**

Appellant, Neftali Velazquez, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for first-degree murder and possession of an instrument of crime ("PIC").[1]  We affirm.

The trial court opinions correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no need to restate them. We add that Appellant shot and killed the victim outside a bar in the late evening/early morning of October 17-18, 2012.

Appellant raises one issue for our review:

_____

[1] 18 Pa.C.S.A. §§ 2502(a) and 907(a), respectively.

_____

*Former Justice specially assigned to the Superior Court.

> WAS THE EVIDENCE SUFFICIENT TO SUSTAIN APPELLANT'S CONVICTIONS FOR FIRST-DEGREE MURDER AND POSSESSING AN INSTRUMENT OF CRIME WHERE THE ONLY EVIDENCE OFFERED IN SUPPORT OF APPELLANT'S GUILT WERE THE PRIOR INCONSISTENT STATEMENTS OF THREE WITNESSES THAT WERE SO INHERENTLY UNRELIABLE THAT THE EVIDENCE MUST BE DEEMED INSUFFICIENT AS A MATTER OF LAW?

(Appellant's Brief at 4).[2]

When examining a challenge to the sufficiency of evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial

---

[2] "Issues not raised in the [trial] court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Generally, "any issues not raised in a [Rule] 1925(b) statement will be deemed waived." *Commonwealth v. Castillo*, 585 Pa. 395, 403, 888 A.2d 775, 780 (2005) (quoting *Commonwealth v. Lord*, 553 Pa. 415, 420, 719 A.2d 306, 309 (1998)).

Here, Appellant failed to argue before the trial court that the statement Jonathan Rodriguez provided during his police interview was involuntary and coerced by police. Appellant also failed to include this issue in his Rule 1925(b) statement. Accordingly, Appellant waived this claim. *See* Pa.R.A.P. 302(a), *supra*; *Castillo, supra*.

evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Hansley**, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011) (quoting **Commonwealth v. Jones**, 874 A.2d 108, 120-21 (Pa.Super. 2005)). Challenges to witness credibility generally implicate the weight, not the sufficiency, of the evidence. **See Commonwealth v. Price**, 616 A.2d 681, 683 (Pa.Super. 1992) (explaining sufficiency challenge asks whether evidence exists on record to support conviction, whereas argument that witness' account is not credible goes to weight). Nevertheless,

[I]n those extreme situations where witness testimony is so inherently unreliable and contradictory that it makes the jury's choice to believe that evidence an exercise of pure conjecture, any conviction based on that evidence may be reversed on the grounds of evidentiary insufficiency, since no reasonable jury could rely on such evidence to find all of the essential elements of the crime proven beyond a reasonable doubt.

**Commonwealth v. Brown**, 617 Pa. 107, 136 n.18, 52 A.3d 1139, 1156 n.18 (2012).

"A prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if it meets additional requirements of reliability." **Commonwealth v. Carmody**, 799 A.2d 143, 148 (Pa.Super. 2002) (citing **Commonwealth v. Lively**, 530 Pa. 464, 610 A.2d 7, 9-10

- 3 -

(1992); Pa.R.E. 803.1).

> The test is a two-part inquiry: 1) whether the statement is given under reliable circumstances; and 2) whether the declarant is available for cross-examination. With respect to the first prong, that the statement is given under reliable circumstances, our [S]upreme [C]ourt has deemed reliable only certain statements; among them is a statement that is **"reduced to a writing and signed and adopted by the witness."** *Lively, supra*, at 47[1], 610 A.2d at 10. *See also* Pa.R.E. 803.1(1). With respect to the second prong, cross-examination, the inconsistent statement itself must be the subject of the cross-examination in order to satisfy the test.

*Carmody, supra* at 148 (some internal citations and footnote omitted).

*See also Lively, supra* at 471, 610 A.2d at 10 (providing prior inconsistent statement is "demonstrably reliable and trustworthy" where statement "had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements").

After a thorough review of the record, the briefs of the parties, the relevant law, and the well-reasoned opinions of the Honorable Genece E. Brinkley, we conclude Appellant's issue merits no relief. The court comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed October 20, 2016, at 2-24; Trial Court Opinion, filed May 17, 2016, at 3) (finding: testimony at trial established Victim died as result of multiple gunshot wounds; at trial, Wendy Quiles testified she stood near Victim when she saw Victim get shot multiple times and she described shooter to police; Detective Derrick Jacobs testified that

he interviewed Ms. Quiles on night of shooting; Detective Jacobs stated police took verbatim statement from Ms. Quiles, each page of which she reviewed and signed; Detective Jacobs said Ms. Quiles identified photograph of Victim; Officer Thorsten Lucke testified he interviewed Ms. Quiles in January 2013; Officer Lucke stated he and fellow officer contemporaneously typed Ms. Quiles' interview questions and answers; Officer Lucke said Ms. Quiles reviewed her answers and signed her statement; Ms. Quiles identified for police photograph of Appellant as shooter and signed her name twice under photograph; Raphael Rodriguez testified at trial that, at time of shooting, he was in bar, when Victim was shot; Raphael Rodriguez testified he told police shooter was named "Nefti," but police wrote "Neftali" in his statement and told him to write "Neftali" near identification photograph of Appellant; Raphael Rodriguez said "Nefti" was not Appellant; Raphael Rodriguez also told police Appellant shot Victim after Victim approached Jonathan Rodriguez inside bar, and Appellant wanted to shoot Victim, but Jonathan Rodriguez told Appellant not to do so inside bar; Raphael Rodriguez told police Appellant was carrying two black semiautomatic pistols on night of incident, and Appellant fired so many shots at Victim that Appellant had to reload; Detective William Sierra testified he interviewed Raphael Rodriguez, who identified for police photograph of Appellant as shooter and signed his name below photograph; Detective Sierra stated Raphael Rodriguez had opportunity to review his statement, and Raphael

Rodriguez made correction to and signed statement; Detective Sierra said written statement was verbatim representation of Raphael Rodriguez's interview; Detective Sierra also testified that Raphael Rodriguez signed and identified for police photograph of Appellant as shooter; Detective Sierra said police did not coerce Raphael Rodriguez's statement; Jonathan Rodriguez testified at trial that on night of shooting he was in bar with Appellant when Appellant and Victim argued; Jonathan Rodriguez said he told Appellant to take issue with Victim outside bar, and once Appellant and Victim went outside, Appellant fired several shots at Victim; Jonathan Rodriguez testified he identified for police photograph of Appellant as shooter and wrote "Shot [Victim]" near photograph; Jonathan Rodriguez referred to Appellant in his statement as "Nefti"; Jonathan Rodriguez and Raphael Rodriguez both testified Appellant threatened them not to talk about shooting and both feared consequences if Appellant learned they had talked to police about shooting; Officer Thomas Gaul testified he interviewed Jonathan Rodriguez; Officer Gaul stated Jonathan Rodriguez had the opportunity to review his statement and Jonathan Rodriguez signed each page of statement; Officer Gaul testified that Jonathan Rodriguez signed his name on photograph of Appellant and wrote "Shot [Victim]" next to photograph; evidence at trial was sufficient to allow jury to conclude Appellant was in possession of gun and fatally shot Victim multiple times). The record supports the trial court's rationale.

Furthermore, testimony at trial established that the police officers and detectives who interviewed Ms. Quiles, Raphael Rodriguez, and Jonathan Rodriguez typed the interview questions and answers comprising the witnesses' respective statements contemporaneously and verbatim.[3] (**See** N.T. Trial, 1/20/16, at 154-55, 170-72; N.T. Trial, 1/22/16, at 87-88, 120.) The record also indicates Ms. Quiles, Raphael Rodriguez, and Jonathan Rodriguez all reviewed and signed their respective written police interview statements and identification photographs. (**See** N.T. Trial, 1/20/16, at 154-155, 170-73; N.T. Trial, 1/22/16, at 87-88, 95-96, 105, 118-19.) Thus, the police interview statements of Ms. Quiles, Raphael Rodriguez, and Jonathan Rodriguez were demonstrably reliable and trustworthy. **See Carmody, supra**; **Lively, supra**. Therefore, Appellant's claim merits no relief. Accordingly, we affirm.

Judgment of sentence affirmed.

_____

[3] "Issues not raised in the [trial] court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Here, during trial, Appellant failed to challenge the Commonwealth's use as substantive evidence of the written police interview statements of Ms. Quiles, Raphael Rodriguez, and Jonathan Rodriguez when they recanted those statements at trial. Accordingly, Appellant waived this claim. **See id.** We address Appellant's claim, however, insofar as Appellant challenges on appeal the reliability of the statements Ms. Quiles, Raphael Rodriguez, and Jonathan Rodriguez provided authorities during their respective police interviews.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/20/2017

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH | : | CP-51-CR-0010833-2013 |
| | : | |
| vs. | | |
| | | |
| NEFTALI VELAZQUEZ | : | SUPERIOR COURT<br>597 EDA 2016 |



CP-51-CR-0010833-2013 Comm. v. Velazquez, Neftali
Opinion

7448066971

FILED

MAY 1 7 2016

Criminal Appeals Unit
First Judicial District of PA

**BRINKLEY, J.**                                                               **MAY 17, 2016**

## OPINION

Defendant Neftali Velazquez appeared before this Court for a jury trial and was found guilty of first-degree murder and possession of an instrument of crime (PIC). This Court sentenced Defendant to a mandatory sentence of life without the possibility of parole on the first-degree murder charge and imposed no further penalty on the PIC charge. Defendant appealed the judgment of sentence to the Superior Court and raised the following issue on appeal: (1) Whether the evidence was sufficient to find Defendant guilty of first-degree murder and PIC.

## PROCEDURAL HISTORY

On May 22, 2013, Defendant was arrested and charged with murder, PIC, and violations of the Uniform Firearms Act 6106 and 6108. From January 20 to 25, 2016, a trial was held in the presence of a jury. On January 25, 2016, Defendant was found guilty of first-degree murder and PIC. On that same day, this Court sentenced Defendant to a mandatory sentence of life without the possibility of parole on the first-degree murder charge and imposed no further penalty on the

1

PIC charge. On February 18, 2016, Defendant, through counsel, filed a Notice of Appeal to the Superior Court. On April 5, 2016, after receiving the complete notes of testimony, this Court ordered Defendant to file a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b) and Defendant did so on April 22, 2016.

## FACTS

Trial began in this matter on January 20, 2016. Defendant was represented at trial by Fortunato N. Perri, Jr., Esquire, while the attorney for the Commonwealth was Brett Furber, Esquire. The Commonwealth called Officer Patrick Quinn ("Quinn") as its first witness. Quinn testified that he had been a police officer since September 2007 and had been assigned to the 25th District in West Kensington for his whole career. Quinn further testified that, on October 17, 2012, he was working in a patrol car with his partner, Officer Rahill, when they received a radio call of a shooting in the area of Lawrence and Cambria Streets. Quinn stated that they arrived at the location in less than a minute and, as they approached the intersection, they noticed a large crowd of people. Quinn further stated that they approached the crowd and saw the decedent lying on the curb on Cambria Street next to two parked cars. Quinn testified that the decedent was lying face down with several gunshot wounds to his torso and that he observed several shell casings lying on the sidewalk in the vicinity of the decedent. Quinn further testified that medics arrived immediately but were unable to revive the decedent. Quinn stated that he and Rahill established a perimeter to preserve the crime scene and that no one approached him at the scene with information. Quinn testified that Rahill was eventually able to identify the decedent as Domingo Rivera ("Rivera"). (N.T. 1/20/2016 p. 49-59).

The Commonwealth called Wendy Quiles ("Quiles") as its next witness. Quiles testified that she was at a bar at Lawrence and Cambria Street with her friend, "Gina" and her cousin,

2

"Tatiana" on October 17, 2012. Quiles further testified that they were together for approximately 3 hours and were eating and drinking during that time. Quiles stated that their group also met up with a man, "June", at a house prior to going to the bar. Quiles further stated that Gina wanted to grab something to eat, so they left but went to the bar at Lawrence and Cambria instead. Quiles testified that she was at the bar for approximately 30 minutes when she and June went outside to smoke a cigarette while Gina and Tatiana stayed in the bar. Quiles further testified that June was then shot while they were outside the bar. Id. at 66-73.

Quiles testified that June was shot roughly ten times in his back and she did not see the person who shot him. Quiles further testified that she ran behind a car for cover, then went back to the bar to Gina and Tatiana. Quiles stated that she did not remember how long it took police to arrive but she did not talk to police at the scene. Quiles further stated that the police took her to the Homicide Unit to give a statement later that night, but she did not remember what she told them. Quiles testified that she described the shooter as a male to police, but gave no further description of him. Quiles then testified that she gave the following answer to police when asked to describe what happened,

> "I went outside of the bar to smoke a cigarette. And [June] was actually in front of me. I lit my cigarette. And I couldn't have taken two puffs before I hear all of these gunshots. I turned a little and saw a Dominican guy wearing a black t-shirt with his hand raised and shooting a gun."

Quiles further testified that she gave the following description of the shooter in her statement to police,

> "He was dark-skinned. About my height maybe. He wasn't tall. He was wearing a black t-shirt. It was dark, so I can't really say what color his hair was, but I can tell you he wasn't bald...He wasn't big, and he wasn't small. I can't really tell men's weight, so I would say he was average."

3

Quiles testified that the police showed her photographs at that time, but she was unable to identify anyone. Id. at 74-83.

Quiles testified that she remembered returning to the Homicide Unit on January 7, 2013 and being asked if she could identify the shooter. Quiles further testified that she did not identify the shooter to police. Quiles testified that her statement to police identified the shooter in the photo array she was shown but the statement was wrong. Quiles further testified that her signature and the date were at the bottom of her statement. Quiles testified that she circled a photograph in the photo array but only because she was told by police that she had to pick someone. Quiles further testified that the police did not force her to pick a specific picture but told her to pick one of the pictures in the array. Quiles testified at trial that her signature and the date were at the bottom of the photo array. Quiles further testified that she never told police the answers in her statement and that they made up the answers. Quiles testified that her signature was on the statement of adoption attestation, but she did not remember signing it. Id. at 83-91.

The Commonwealth called Dr. Albert Chu ("Chu") as its next witness. Chu testified that he was the Deputy Chief Medical Examiner at the Philadelphia Medical Examiner's Office and had been employed at the Philadelphia Medical Examiner's Office since July 2014. Chu further testified that he went to medical school at the State University of New York in Buffalo, then a residency training program in anatomic and clinical pathology at the Hospital of the University of Pennsylvania in Philadelphia and a fellowship in forensic pathology at the Office of the Chief Medical Examiner for the State of Maryland in Baltimore. Chu stated that he had worked previously at the Harris County Institute of Forensic Science in Houston for 9 years and had testified as an expert in forensic pathology over 100 times. Chu was subsequently offered and accepted by this Court as an expert in the field of forensic pathology. Id. at 106-09.

4

Chu testified that he did not perform the autopsy on Rivera, but had reviewed the report prepared by the doctor who had and was able to come to a conclusion on the manner and cause of Rivera's death. Chu further testified that Rivera died from multiple gunshot wounds and suffered a total of ten gunshot wounds. Chu testified that the first gunshot wound entered on the right side of his upper back, passed through his right lung and aorta, and was recovered from the upper left side of the chest. Chu further testified that the second gunshot wound entered on the right side of the back below gunshot wound one, passed through the right lung and exited on the upper right side of the chest. Chu testified that the third gunshot wound also entered on the right side of the back, passed through the right lung, and was recovered from the right-center of the chest. Chu further testified that the fourth gunshot wound entered just below gunshot wound three, passed through the right lung, then exited on the right side of the chest. Id. at 110-14.

Chu testified that the fifth gunshot wound entered on the right side of the back, passed through Rivera's liver and diaphragm, then exited on the left side of the chest. Chu further testified that the sixth gunshot wound entered on the right side of the lower back, also passed through Rivera's liver and diaphragm, then exited on the left side of the chest. Chu testified that the seventh gunshot wound entered through the right buttocks, then hit the right kidney and liver before exiting on the right side of the chest near the right nipple. Chu further testified that the eighth gunshot wound entered on the left buttocks, then hit the pelvic bone and large intestine before exiting on the right side of the lower abdomen. Chu testified that gunshot wound nine entered on the left buttocks, then passed through the large intestine and was recovered from within the abdominal cavity. Chu further testified that gunshot wound ten entered on the back of the right thigh and exited through the front of the right thigh. Id. at 114-15.

Chu testified that Rivera also had a number of abrasions on his face, elbow and knees as

5

well as injuries consistent with bullet fragments striking the skin on the right side of his chest. Chu stated that such injuries usually occurred when the bullet struck something else prior to hitting the body. Chu testified that there was no gunpowder stippling, soot deposition or muzzle imprints around any of the entrance wounds. Chu further testified that muzzle imprints occurred when a gun is in contact with the person when fired, while soot deposition occurred when the gun is within six inches of the person when fired, and stippling occurred when the gun is within approximately two feet of the person when fired. Chu testified that a toxicology report was performed on Rivera and Rivera tested positive for Alprazolam, Ibuprofen, and Ethanol. Chu further testified that the ballistics evidence collected was placed in a sealed envelope and submitted to police. Id. at 116-21.

The Commonwealth called Officer William Trenwith ("Trenwith") as its next witness. Trenwith testified that he had been an officer with the Crime Scene Unit for 24 years and had been a Philadelphia Police Officer since 1977. Trenwith testified that the Crime Scene Unit was notified of a homicide in the area of Lawrence and Cambria Streets at 12:05 a.m. on October 18, 2012, and he arrived at the scene at 12:28 a.m. Trenwith further testified that police were protecting the scene when he arrived and he took a series of photographs of the scene. Trenwith stated that there was a bar, Jecko's Lounge, on the southwest corner of Lawrence and Cambria, and Rivera's body was to the west of the bar. Trenwith further stated that all of the ballistic evidence was located around Rivera's body and there was no evidence of stray bullets hitting the cars or trees in the vicinity. Trenwith testified that all fired cartridge casings recovered from the scene were 9 millimeter semiautomatics, while he recovered currency, cigarettes, a lighter, and an asthma inhaler from Rivera's body. Trenwith further testified that flattened projectiles were recovered between Rivera's chest and shirt. Trenwith stated that a total of 18 pieces of ballistics

6

evidence, including 13 fired cartridge casings and 5 projectiles, were recovered from the scene and sent to the Firearms Identification Unit. Trenwith further stated that the projectiles were flattened because they had hit a hard surface, likely the concrete under Rivera, and, when considered with the arrangement of the ballistics evidence in the immediate vicinity of his body, the shooter was likely standing directly over top of him as he fired the gun. Id. at 121-46.

The Commonwealth called Detective Derrick Jacobs ("Jacobs") as its next witness. Jacobs testified that he had been a detective with the Homicide Unit since 2011 and had been a Philadelphia Police Officer for 20 years. Jacobs further testified that he and Detective Pitts interviewed Quiles at 12:55 a.m. on October 18, 2012. Jacobs testified that they took a verbatim statement from Quiles and asked her to review and sign each page of the statement, which she did. Jacobs further testified that there was no suspect at the time the statement was taken and that Quiles did not appear intoxicated during the interview. Jacobs testified that Quiles identified a photograph of Rivera as the man she was with. Jacobs further testified that no one forced Quiles to give the description of the shooter and they did not have that information prior to her volunteering it. Id. at 151-61.

The Commonwealth called Detective Thorsten Lucke ("Lucke") as its next witness. Lucke testified that he had been a Homicide Detective since July 2006 and had been a Philadelphia Police Officer for 20 years. Lucke further testified that he interviewed Quiles with Detective Byard in January 2013. Lucke stated that Quiles was brought back to be shown a photo array and that Quiles identified a photograph of Defendant as the shooter. Lucke testified that Quiles sat beside Byard as he typed her answers on the computer and then reviewed her answers after the statement was complete. Lucke further testified that Quiles signed her name and the date on the bottom of her statement. Lucke testified that Quiles drew a circle around Defendant's

7

photograph and then signed her name twice on the photo array. Lucke further testified that neither he nor Byard told Quiles that she had to pick a photograph but simply asked her if she recognized anybody. Lucke testified that the only photograph Quiles recognized was Defendant's and, when he asked her who was in the photograph, she responded, "That's the guy from that night." Id. at 164-74.

The Commonwealth called Ann Marie Barnes ("Barnes") as its next witness. Barnes testified that she was a civilian assigned to the Firearms Identification Unit and had been with the unit for approximately 8 years. Barnes further testified that she was initially assigned to the unit as an Integrated Ballistic Identification System technician for 2 years in the unit prior to becoming a firearms examiner. Barnes stated that she had to complete an 18-month training program under the supervision of the senior examiner in the Firearms Identification Unit and was also trained by the Bureau of Alcohol, Tobacco and Firearms in serial number restoration. Barnes further stated that she toured numerous firearms manufacturers and attended numerous autopsies involving gunshot wounds as part of her training. Barnes testified that she was currently 5 classes away from completing a criminal justice degree at Rosemont University and had also provided training for various units within the Philadelphia Police Department, the District Attorney's Office, the Public Defender's Office, and the Medical's Examiner's Office. Barnes further testified that she had previously testified as an expert in firearms identification approximately 40 times. Barnes was subsequently offered and accepted by this Court as an expert in firearms identification and ballistic evidence. (N.T. 1/21/2016 p. 5-10).

Barnes testified she prepared reports on the ballistics recovered from the scene and from the Medical Examiner's Office in the instant case. Barnes further testified that items 1 and 6 recovered from the crime scene were 9 millimeter Luger Federal Brand fired cartridge casings

8

with Glock Sigma-type firing pin impressions. Barnes testified that items 2 through 5, 7 through 12, and 17 were 9 millimeter Luger Aguila brand fired cartridge casings with Glock Sigma-type firing pin impressions. Barnes further testified that item 13 was an uncoated lead fragment while item 16 was a copper-alloyed bullet jacket of indeterminable caliber. Barnes testified that items 14, 15 and 18 were 9 millimeter bullet projectiles with a copper-alloyed jacket and polygonal rifling. Barnes testified that items 1 through 4 from the Medical Examiner's office were 9 millimeter Luger bullet specimens with copper-alloyed jackets and polygonal rifling. Barnes further testified that the specimens were recovered from Rivera's peritoneum, right subcutaneous chest, and left upper chest. Barnes testified that she also received five copper-alloyed bullet jacket fragments and five uncoated lead fragments which were unsuitable for microscopic comparison. Barnes further testified that, based upon her comparison of the fired cartridge casings, she was able to determine that all of them were fired from the same firearm, although she did not receive a firearm to compare them to. Barnes testified that the bullets, bullet jackets, and bullet jacket fragments were too damaged to make an identification but they shared the same class characteristics and caliber. Barnes further testified that the Glock Sigma-type firing pin impression was specific to Glock-type firearms and that the class characteristics and polygonal rifling were also consistent with a Glock-type firearm being used. Id. at 16-28.

The Commonwealth called Raphael Rodriguez ("Raphael") as its next witness. Raphael testified that he was in custody after pleading guilty to a crime in 2013 but had not agreed to testify in the instant case as part of his guilty plea. Raphael testified that he saw Rivera get shot and killed but he did not see the shooter in the courtroom. Raphael further testified that about ten days after the shooting, police came to his house and arrested him on a warrant. Raphael stated that he was high when he was arrested and was unable to give a statement to police at the time.

9

Raphael further stated that police picked him up from Curran-Frumhold Correctional Facility about a week later and took him to the Homicide Unit to give a statement regarding Rivera's murder. Raphael testified that he did not know Defendant and that the person who shot Rivera was fatter and had more hair than Defendant. Raphael further testified that he knew Jonathan Rodriguez ("Jonathan") and was familiar with the area around 3rd, Indiana, and Cambria Streets. Id. at 35, 55-61.

Raphael testified that his signature was at the bottom of the first page of the statement as well as on the first page of the Spanish translation. Raphael further testified that the detectives who took the statement from him spoke to him in Spanish and that he was not under the influence of any drugs or alcohol when he gave the statement. Raphael further testified that he knew Rivera as "June" and that Rivera was shot on the sidewalk near Jecko's at Lawrence and Cambria. Raphael stated to police that the person who shot Rivera was "Neftali", but testified at trial that he told police the person was named "Nefti" and they wrote "Neftali". Raphael stated to police that he had met Neftali through a friend of his named Jose and that Neftali hung out in the area around 3rd, Indiana and Cambria Streets. Raphael testified at trial that he knew the person as Nefti and it was the interviewing officers who told him that the name was Neftali. Id. at 62-69.

Raphael stated to police that Neftali killed Rivera because Rivera had pulled a gun on "Moncho" and had problems with Jonathan. Raphael further stated to police that Neftali was Moncho's brother and that Moncho and Jonathan were related. Raphael testified at trial that he did not know whether "Nefti" was Moncho's brother and was only repeating what he heard others say. Raphael stated to police that Moncho controlled the sale of heroin in the area and was a friend of his. Raphael testified at trial that he identified photographs of Jonathan, Moncho and another person, but did not identify a photograph of Neftali. Raphael further testified at trial

10

that his signature and the name "Neftali" was written in his handwriting underneath a photograph of Defendant, but the police told him to sign his name and put the name "Neftali" under the photograph. Raphael testified at trial that his signature was underneath the photographs of Moncho and Jonathan. Raphael further testified that the police never showed him any picture of Defendant and simply told him to write "Neftali" on a blank page. Id. at 70-76.

Raphael testified at trial that he identified a photograph of Moncho as the person who ordered that Rivera be killed because Rivera pulled a gun on him. Raphael further testified that he did not know if Rivera sold drugs in the area of 3rd, Cambria and Indiana, but he knew that Rivera had problems with Moncho and Jonathan. Raphael testified at trial that he identified a fourth photograph as "Ariel". Raphael stated to police that Ariel was Moncho and Neftali's brother and that all three of them ordered Rivera to be killed. Raphael testified at trial that he knew Ariel, but did not know Neftali. Raphael stated to police that Rivera and Jonathan had problems because,

> "[Rivera] was always fucking with Jonathan by giving dirty looks when he would pass him by. Like a week before his death, Neftali, Ariel, and another boy fired gunshots at [Rivera] near Lawrence and Cambria when he was standing in front of a store. They tried shooting at [Rivera] prior to that, like two weeks prior to the shooting in front of the store."

Raphael testified at trial that the shooter fired a series of shots, then paused before firing a second series of shots. Raphael stated to police that Neftali was carrying two black automatic pistols and that he fired a lot, changed the magazine in his gun, then fired some more. Raphael testified at trial that "Nefti" had two guns, but only used one to do the shooting. Id. at 78-82.

Raphael stated to police that he was with Jonathan and "Eddie" when the shooting took place, but was unable to identify a photograph of Eddie. Raphael testified at trial that Rivera came to Jecko's with two females, and that he was at the bar with Jonathan and "Nefti". Raphael

11

stated to police that,

> "Me, Neftali, and Jonathan were already in the bar. [Rivera]
> came in with two girls. [Rivera] started dancing with the two
> girls and, as [Rivera] is dancing, he asked Jonathan to join him
> dancing with the two girls. Asking what we were going to do
> with them. [Rivera] was being a smart ass, so Jonathan told him
> to go to hell. After that, Neftali wanted to shoot [Rivera] right
> in the bar, but Jonathan told him not to do it in the bar or in
> the bathroom. Neftali left the bar first, and then [Rivera] left
> out, and then me and Johnathan went outside, too. Once outside,
> seconds later, the gunshots were fired."

Raphael stated to police that he saw Neftali and Moncho the next day in the basement of a house near Mascher and Gurney Streets and they told the people present not to talk about the murder. Raphael testified at trial that he remembered going to the house at Mascher Street the day after Rivera was shot and that Nefti was present there. Raphael further testified at trial that it was not just Nefti who told the people at the house not to talk about the murder but everyone present told him not to talk about the murder. Raphael testified at trial that he could not remember if Moncho or Ariel were at the house, because there was so many people at the house. Id. at 83-89.

Raphael stated to police that he requested to be transported to the Homicide Unit on October 28, 2012 because he had information about the instant case. Raphael testified at trial that he told police he had open bench warrants and asked homicide detectives for help with his bench warrants. Raphael further testified that he was bound to a chair at the Homicide Unit and hit by one of the detectives because he did not want to talk to them, although he was unable to describe the detective who hit him. Raphael testified at trial that, when he told police he had been treated well at the Homicide Unit, he was not referring to the detective who had hit him. Raphael further testified at trial that he did not want to be videotaped when he gave his statement because he was afraid that the tape could end up in possession of people on the street who know him. Raphael testified at trial that he initialed each page of the statement and made a change to the

12

Spanish portion of the statement, because the translation software incorrectly translated a word as "stabbing" instead of "shooting". Raphael further testified at trial that his signature was on each page of the statement. Raphael testified at trial that his statement to police was accurate, except that the shooter's name was "Nefti" rather than "Neftali". Id. at 89-100.

The Commonwealth called Jonathan as its next witness. Jonathan testified that he was presently in custody for violating his probation and that he sold drugs in the Kensington neighborhood of Philadelphia but was unfamiliar with the area around 3rd, Cambria and Lawrence Streets. Jonathan further testified that he did not remember what happened on October 17, 2012 because he was drunk and high at the time. Jonathan testified that he knew Defendant because they grew up together in Puerto Rico but could not remember if Defendant was present when Rivera was killed. Jonathan stated that he remembered being taken to Homicide and being asked a couple of questions but could not remember reviewing and signing a statement. (N.T. 1/22/2016 p. 26-32).

After the Commonwealth showed Jonathan the statement he gave to police on January 4, 2013, Jonathan testified that he recognized his signature at the bottom of the first page and his initials next to a correction on the statement. Jonathan further testified that he was at the police station for approximately 18 hours prior to giving the statement and had not had any drugs or alcohol while he was at the station. Jonathan testified at trial that he told police, "I am sorry I did not tell you guys sooner what happened. You have to understand, Nefti grabbed me after he killed June, and he told me not to say anything." Jonathan further testified at trial that he told police, in response to their statement that they were going to interview him in reference to Rivera's murder, "[L]ike I said, I seen Nefti shoot him, but Nefti came to me after it happened and told me not to tell anyone." Id. at 33-39.

13

Jonathan testified that, after the police asked him to describe in his own words what happened, he gave the following answer,

> "I was in Jecko's bar and June was in there and so was Nefti. The bar was pretty crowded. You see, June was mean with everybody. I know June a long time, and I would tell him to calm down, but he was always giving people a hard time. Everything was cool until June came in the bar. Then Nefti was getting angry with June. Nefti and June were arguing a little bit in the bar. I know the owner, and that bar is cool. And I told them both to go outside and not to start trouble inside. They both went outside of the bar. Then, as they were both going outside, I was right behind them. Then they went out the door. And once they were outside, Nefti started shooting June. I ran back inside of the bar, and the shots were still going. Everybody in the bar started running back towards the bathrooms. Once the shots stopped, everybody was yelling to get out of the bar, and they were going to close the bar. I ran outside and ran to my mother-in-law's house. I found out the next day June died."

Id. at 39-40.

Jonathan testified at trial that he told police he had known Nefti for about 4 years and that Nefti was related to his uncle's wife. Jonathan further testified at trial that he identified a photograph of Defendant as "Nefti" and wrote "Shot June" under the photograph. Jonathan testified at trial that he never told the police that the person in the photograph was the person who shot Rivera, but only that he knew the person. Jonathan further testified at trial that he knew Rivera before he was murdered, but did not have any problems with him. Jonathan testified that Rivera was a bully and he remembered that Rivera was bullying people in the bar on the night he was killed. Jonathan further testified at trial that he told the police that Nefti approached him the next day and said to him, "You didn't see nothing, and you better not tell. What is done is done." Id. at 40-49.

Jonathan testified at trial that he told police, "I would have told you this sooner but, you

14

see, Nefti will get me and my family if he knows I told you this." Jonathan further testified at trial that, in response to the police informing him that he would be required to testify at trial, he told them, "[I]f Nefti comes at me, I need to get moved." Jonathan testified that he remembered signing and initialing each page of the statement, but did not remember the police asking him if he wanted to have the interview videotaped. Jonathan further testified that he also identified a photograph of Rivera to police and that he heard four or five gunshots when Rivera was killed. Jonathan testified at trial that he did not know Raphael, nor had he ever sold drugs with Raphael. Id. at 49-58.

The Commonwealth called Officer George Soto ("Soto") as its next witness. Soto testified that he had been a Philadelphia Police Officer for 7 years and was on duty on October 28, 2012 when he responded to a call of a person with a gun in the 2900 block of North 6th Street. Soto further testified that he came into contact with Raphael when he arrived on location. Soto testified that Raphael was alone when he arrived and told him that a group of Hispanic males came to that location to go after him. Soto further testified that he asked Raphael why the males came after him and Raphael told him, "Cause I was a witness to a homicide about two weeks ago" at a bar at Lawrence and Cambria. Soto stated that he was aware of the homicide that occurred at that location but had no other background information or involvement with the homicide investigation. Id. at 70-75.

Soto testified that Raphael told him that he was at the bar when Rivera walked in with two females. Raphael further told him that Rivera started to dance with the two females, then walked over to Jonathan and said to him, "Listen, I have two females here. One for you, one for me." Raphael told him that Jonathan got upset at Rivera and Nefti asked him, "Is this the male you have been having problems with?", to which Jonathan replied, "yes." Raphael further told

15

him that Nefti reached for a firearm in his waistband, but Jonathan said to him, "No. Not here. It's too many people." Raphael told him that Rivera went to the bathroom, at which time one of the males walked outside the bar and was later followed by Rivera. Raphael further told him that he saw Rivera walking alongside the bar on Cambria Street and then Nefti pulled out a firearm and shot Rivera multiple times. Soto testified that he discovered Raphael had two outstanding warrants so he placed him in the backseat of his patrol car, then took him to Homicide to be interviewed. Soto further testified that Raphael appeared to be very nervous and frightened. Id. at 75-78.

The Commonwealth called Detective Thomas Gaul ("Gaul") as its next witness. Gaul testified that he had been in the Homicide Unit since 2005 and had assisted in the investigation of Rivera's murder. Gaul further testified that he interviewed Jonathan at 9:30 a.m. on January 4, 2013 after Jonathan had been brought to Homicide at around 3:30 p.m. the previous day. Gaul testified that Jonathan had the opportunity to review his statement after it was taken and signed each page of the statement. Gaul further testified that Jonathan did not appear to be under the influence of drugs or alcohol when he gave his statement. Gaul testified that Jonathan was shown a single photograph of "Nefti" due to his prior relationship with him and was asked if he recognized him. Gaul further testified that Jonathan wrote "Shot June" next to the photograph and signed his name on the page. Gaul testified that the photograph was on the paper when Jonathan signed the paper and he was not forced to sign the photograph. Gaul further testified that Jonathan also signed a photograph of Rivera and appeared very nervous during the statement. Id. at 84-96.

The Commonwealth called Detective William Sierra ("Sierra") as its next witness. Sierra testified that he had been a detective in the Homicide Division for 10 years and interviewed

16

Raphael on November 6, 2012. Sierra further testified that the interview was typed in English, then translated into Spanish. Raphael was then given the opportunity to review the Spanish portion of the interview and he made a correction to the Spanish translation. Sierra testified that Raphael was shown a photograph of Defendant and signed his name and the date below the photograph. Sierra further testified that the photograph was on the page when Raphael signed it and no one forced him to sign the photograph. Id. at 102-112.

Sierra testified that Raphael was originally transported to Homicide on October 28, 2012 but appeared to be under the influence of drugs or going through withdrawal at that time and was unable to be interviewed. Sierra further testified that Raphael was concerned about his two bench warrants and wanted the Homicide Unit to make the warrants go away in exchange for his statement. Sierra testified that he told Raphael that he could not do that and that Raphael was in custody for his warrants when he was next interviewed on November 6. Sierra further testified that Raphael was not beaten or forced in any way to say anything in his statement. Sierra testified that he had Raphael sign as close as he could to his last answer so nothing could be added to his statement and that the statement was a verbatim statement. Sierra further testified that Raphael never indicated that a person named "Nefti" was the shooter but he in fact identified a photograph of Defendant as the shooter. Id. at 115-20.

The Commonwealth then read a stipulation that if John Cahill ("Cahill") was called to testify, he would testify that he was a Homicide Detective assigned to the Fugitive Squad and that he was assigned to the instant case on March 12, 2013, the day after an arrest warrant was issued for Defendant. Cahill would further testified that he prepared wanted posters to distribute throughout the police department and contacted the U.S. Marshal Federal Fugitive Task Force to give them Defendant's information. Cahill would testify that on March 14, 2013, detectives

17

conducted surveillances of addresses associated with Defendant with negative results. Cahill would further testified that on March 29, 2013, Philadelphia Police and U.S. Marshals went to 2843 North 2nd Street and were admitted by Defendant's mother-in-law, Mirtha Pirela ("Pirela"). Cahill would testify that Pirela told them that Defendant and his wife had moved to Puerto Rico. Cahill would further testify that Philadelphia Police contacted U.S. Marshals in Puerto Rico regarding Defendant and later that day he was advised by the Marshals that Defendant was in their custody in Puerto Rico. Cahill would testify that on May 22, 2013, Defendant was returned to Philadelphia from Puerto Rico and met at the airport by Philadelphia Police, who arrested him on the warrant. Id. at 121-23. After reading the stipulation, the Commonwealth rested. Id. at 129.

The defense then read a stipulation, by and between counsel, that on October 12, 2012, prior to the homicide, Defendant and his wife purchased two round-trip airline tickets to Puerto Rico. The departing flight was scheduled for December 10, 2012 and the return flight was scheduled for January 21, 2013, prior to the issuance of the arrest warrant. However, neither Defendant nor his wife were on the return flight. The defense further stipulated that if Pedro Gomez, Maria DeJesus, Alberto Velazquez, Roberto DeJesus and Brenda Velazquez were called to testify, they would each testify that they knew Defendant, that they knew other individuals who knew Defendant and that Defendant had a reputation as a peaceful, law-abiding individual among those who knew him. Id. at 129-31. After reading these stipulations, the defense rested. Id. at 131.

## ISSUE

I.  **WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF FIRST-DEGREE MURDER AND POSSESSION OF AN INSTRUMENT OF CRIME.**

18

## DISCUSSION

**II.    THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF FIRST-DEGREE MURDER AND POSSESSION OF AN INSTRUMENT OF CRIME.**

### 1.    Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder

19

unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

**1.    The evidence was sufficient to find Defendant guilty of first-degree murder.**

The evidence presented at trial was sufficient to find Defendant guilty of first-degree murder. To obtain a conviction for first degree murder, the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill. Commonwealth v. Diamond, 623 Pa. 475, 83 A.3d 119, 126 (2013) (citing Commonwealth v. Kennedy, 598 Pa. 621, 959 A.2d 916, 920 (2008)). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Commonwealth v. Padilla, 622 Pa. 449, 80 A.3d 1238, 1244 (2013) (citing Commonwealth v. Houser, 610 Pa. 264, 18 A.3d 1128, 1133-34 (2011)). The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. Commonwealth v. Jordan, 619 Pa. 513, 65 A.3d 318, 323 (2013) (citing Commonwealth v. Rivera, 603 Pa. 340, 983 A.2d 1211, 1220 (2009)). Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury. Id. (citing Commonwealth v. Carroll, 412 Pa. 525, 194 A.2d 911, 916 (1963)).

In the case at bar, the evidence was more than sufficient to find Defendant guilty of first-degree murder. Chu testified that Rivera suffered a total ten gunshot wounds, including wounds to his right lung, aorta, liver, right kidney, and large intestine, and died as a result of the multiple gunshot wounds. Quiles testified at trial that she was standing near Rivera when she saw him get shot multiple times and that she described the shooter to police as "dark-skinned. About my height maybe. He wasn't tall. He was wearing a black t-shirt...I can't really say what color his

20

hair was, but I can tell you he wasn't bald...He wasn't big, and he wasn't small... I would say he was average." Lucke testified that Quiles identified a photograph of Defendant as the shooter and signed her name twice under the photograph. Raphael testified at trial that he was at Jecko's Lounge when Rivera was shot and stated to police that the person who shot Rivera was named Neftali. Raphael further stated to police that Neftali shot Rivera after he approached Jonathan inside the bar with two females and that Neftali wanted to shoot Rivera in the bar but Jonathan told him not to. Sierra testified that Raphael identified a photograph of Defendant as the shooter and signed his name below the photograph. Jonathan testified at trial that he told police that he was at Jecko's bar with "Nefti" when Nefti and Rivera had an argument. Jonathan further stated to police that he told Nefti to take his issues with Rivera outside the bar and that, once both of them went outside, Nefti started shooting Rivera. Jonathan testified at trial that he identified a photograph of Defendant as the shooter and wrote "Shot June" near the photograph. Furthermore, the jury heard testimony from Raphael and Jonathan that Defendant threatened them after the shooting and that they were worried about the consequences if Defendant found out that they had spoken to police about the shooting. Therefore, the jury was provided with evidence as to why both Jonathan and Raphael sought to distance themselves from their statements identifying Defendant as the shooter and were consequently able to assess Raphael and Jonathan's credibility accordingly. Thus, the evidence presented at trial showed that Defendant shot Rivera multiple times in vital areas of his body resulting in Rivera's death. Therefore, the evidence presented at trial was sufficient to find Defendant guilty of first-degree murder.

> **2.    The evidence was sufficient to find Defendant guilty of possession of an instrument of crime.**

The evidence presented at trial was sufficient to find Defendant guilty of possession of an

21

instrument of crime (PIC). A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S.A. § 907(a). An instrument of crime is defined as "[a]nything specially made or specially adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." Commonwealth v. Stokes, 2011 PA Super 261, 38 A.3d 846, 854 (2011). It is undisputed that a gun can be an instrument of crime. Id. Once the factfinder concluded that the defendant was the slayer and that the death resulted from the infliction of a gunshot wound, the factfinder could logically have concluded from all of the evidence that the defendant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. Commonwealth v. Buford, 2014 PA Super 224, 101 A.3d 1182, 1190 (2014) (citing Commonwealth v. Woodbury, 329 Pa.Super. 34, 477 A.2d 890, 893-94 (1984)).

In the case at bar, the evidence was sufficient to find Defendant guilty of PIC. Chu testified that Rivera died from multiple gunshot wounds and suffered gunshot wounds to his right lung, aorta, liver, right kidney, and large intestine. Quiles testified that she witnessed Rivera get shot ten times in the back. Lucke testified that Quiles identified Defendant as the person who shot Rivera. Raphael stated to police that Neftali was carrying two black semiautomatic pistols on the night in question and that he fired so many shots at Rivera that he had to stop and reload. Sierra testified that Raphael identified Defendant as the person who shot Rivera. Jonathon testified at trial that he told police that Defendant shot Rivera outside Jecko's Lounge after the two of them got into argument and that he identified a photograph of Defendant as the person who "shot June." Thus, the evidence presented at trial would allow the jury to conclude that

Rivera's death resulted from the infliction of multiple gunshot wounds and that Defendant was the shooter. Consequently, the jury could have logically concluded that Defendant had possession of a gun, that the gun was an instrument commonly used for criminal purposes and that Defendant's possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. Therefore, the evidence was sufficient to find Defendant guilty of PIC.

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. The evidence was sufficient to find Defendant guilty of first-degree murder and possession of an instrument of crime. Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_____

J.

24

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH            :        CP-51-CR-0010833-2013

**:FILED**

vs.          OCT 2 0 2016

Criminal Appeals Unit
First Judicial District of PA
:

NEFTALI VELAZQUEZ     CP-51-CR-0010833-2013 Comm. v. Velazquez, Neftali
Opinion        SUPERIOR COURT
3084 EDA 2016



BRINKLEY, J.         7514998871         OCTOBER 20, 2016

## OPINION

Defendant Neftali Velazquez appeared before this Court for a jury trial and was found guilty of first-degree murder and possession of an instrument of crime (PIC). This Court sentenced Defendant to a mandatory sentence of life without the possibility of parole on the first-degree murder charge and imposed no further penalty on the PIC charge. Defendant appealed the judgment of sentence to the Superior Court and raised the following issue on appeal: (1) Whether the evidence was sufficient to find Defendant guilty of first-degree murder and PIC.

## PROCEDURAL HISTORY

On May 22, 2013, Defendant was arrested and charged with murder, PIC, and violations of the Uniform Firearms Act 6106 and 6108. From January 20 to 25, 2016, a trial was held in the presence of a jury. On January 25, 2016, Defendant was found guilty of first-degree murder and PIC. On that same day, this Court sentenced Defendant to a mandatory sentence of life without the possibility of parole on the first-degree murder charge and imposed no further penalty on the

1

PIC charge. On February 18, 2016, Defendant, through counsel, filed a Notice of Appeal to the Superior Court. On April 5, 2016, after receiving the complete notes of testimony, this Court ordered Defendant to file a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b). On April 22, 2016, Defendant filed his 1925(b) Statement of Errors, raising a sole claim that the evidence was insufficient to find him guilty of first-degree murder and PIC. On May 17, 2016, this Court filed its opinion in the matter[1]. On August 16, 2016, Defendant's appeal was dismissed by the Superior Court after defense counsel failed to file a brief. On August 23, 2016, Defendant filed a timely petition pursuant to the Post-Conviction Relief Act (PCRA) requesting reinstatement of his appellate rights *nunc pro tunc*. On September 9, 2016, this Court ordered the Commonwealth to file an Answer to Defendant's PCRA petition within 30 days. On September 16, 2016, the Commonwealth notified this Court that it did not oppose Defendant's request to have his appellate rights reinstated *nunc pro tunc*. On September 23, 2016, this Court reinstated Defendant's appellate rights *nunc pro tunc*. On September 29, 2016, Defendant filed a Notice of Appeal to the Superior Court. On October 11, 2016, this Court ordered Defendant to file a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b). On October 19, 2016, Defendant filed his Concise Statement of Errors, again raising the sole issue found in his initial Statement of Errors.

---

[1] The complete factual history of this case and Defendant's jury trial may be found in this opinion.

## CONCLUSION

After a review of the applicable filings, rules of evidence, statutes, and case law, this Court adopts the reasoning found in its May 17, 2016 opinion. The evidence was sufficient to find Defendant guilty of first-degree murder and possession of an instrument of crime.

Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_____ J.

3